# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REBECCA YOUNG, ELIZABETH H. YOUNG and JAMES L. YOUNG | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 10847-VCL |
| | ) | |
| RED CLAY CONSOLIDATED SCHOOL DISTRICT | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: July 10, 2015
Date Decided: October 7, 2015

Richard H. Morse, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF DELAWARE, Wilmington, Delaware; *Counsel for the Plaintiffs Rebecca Young, Elizabeth H. Young, and James L. Young.*

Barry M. Willoughby, William W. Bowser, Michael P. Stafford, Margaret M. DiBianca, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Defendant Red Clay Consolidated School District.*

**LASTER, Vice Chancellor.**

On February 24, 2015, Red Clay Consolidated School District ("Red Clay") sought approval from voters to increase the school-related property taxes paid by owners of non-exempt real estate located within the school district. The referendum passed with 6,395 residents voting in favor and 5,515 against.

The plaintiffs are residents of Red Clay who opposed the tax increase but did not vote because they were unable to access the polls. They contend that to secure a favorable outcome, Red Clay encouraged and facilitated voting by families with children, who Red Clay believed would support the tax increase because of their desire to fund the schools that their children attended. At the same time, Red Clay discouraged and raised impediments to voting by elderly and disabled residents, who Red Clay believed would oppose the tax increase because many of them live on fixed incomes. Framed as legal claims, the plaintiffs assert that Red Clay deprived them of their right to vote without due process of law and denied them equal protection under the laws as guaranteed by the Fourteenth Amendment of the United States Constitution. They separately argue that Red Clay violated Article I, § 3 of the Delaware Constitution, which states that "[a]ll elections shall be free and equal."

Red Clay has moved to dismiss the complaint for failing to state a claim on which relief can be granted. This decision denies Red Clay's motion. This ruling does not mean that the plaintiffs ultimately will prevail on the merits, only that they have pled sufficient facts to move beyond the pleading stage.

In the course of analyzing the plaintiffs' claims, this decision concludes that the plaintiffs would not have been able to state a claim for relief if Red Clay only had

1

engaged in certain limited types of election-related conduct. This ruling creates an opportunity for Red Clay to address this litigation by calling a new special election and limiting the scope of its electoral interventions during that election. If Red Clay's voters ratify the result of the February 2015 special election by again voting in favor of the tax increase, then this litigation would be moot.

## I. FACTUAL BACKGROUND

The facts for purposes of the motion to dismiss are drawn from the verified supplemental and amended complaint (the "Complaint") and the documents it incorporated by reference. At this stage of the case, the Complaint's well-pled allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

### A. The Special Election

Under Delaware's statutory scheme for funding public schools, a portion of each school district's funding comes from property taxes paid by owners of non-exempt real estate located within the district. *See* 14 *Del. C.* § 1902. The Delaware Code empowers the school board for each district to set the amount of the tax that property owners must pay, but the school board cannot levy the tax unilaterally. The school board first must "call a special election to be held at the polling place or places designated by the Department of Elections conducting the election." *Id.* at § 1903. The outcome of the special election determines whether the tax can be levied: "If the majority of the votes cast at the election . . . shall be for additional tax, the tax shall be levied and collected as provided in this chapter." *Id.* at § 1911.

The Board of Education of Red Clay (the "Board of Education") is the school board that oversees Red Clay. The Board of Education called for a special election that took place on February 24, 2015 (the "Special Election"). The purpose of the Special Election was to obtain authority to raise the tax rate on non-exempt real property in the district by a total of 35 cents per $100 of assessed value. The proposal called for the rate to increase over a three-year period, rising by 20 cents in 2016, 10 cents in 2017, and 5 cents in 2018. At the time, the average assessed value of a taxable parcel of real estate in Red Clay was $80,100, resulting in the owners of an average taxable parcel paying $1,419 per year in school-related property tax. After the three-phase in, the owners of an average parcel would pay approximately $280 more per year, or roughly $23 more per month. The proposal thus contemplated an approximately 20% increase in the school-related taxes paid by the average property owner. The first year increase alone would generate an incremental $15 million per year for the schools in Red Clay. Compl. ¶ 14. When fully implemented, the increase would generate an incremental $26 million per year.

Obtaining approval for the tax increase was important to Red Clay. Patti Nash was a Red Clay employee who acted as a spokesperson for the district in connection with the Special Election. On April 9, 2015, after the referendum passed, she told a news reporter from NBC10 that without a successful vote, Red Clay "would not have had the money to pay [its] teachers." Compl. ¶¶ 20-21.

Going into the Special Election, Red Clay had particular reason to be concerned about whether the referendum would pass. Governor Jack Markell's proposed budget for

the 2015-16 fiscal year reduced the credit that Delaware provides to senior citizens for school-related property taxes. Under the status quo, Delaware provided a credit for 50% of the school-related taxes paid by a property owner 65 years of age or older, up to a cap of $500. The proposed budget contemplated either lowering the percentage to 25% or reducing the cap to $250. A news article submitted by Red Clay reported that even though the Governor's budget was only a proposal, supporters of public schools were worried that senior citizens would be anxious about the change, which would make it "harder to get the votes to approve tax increases" and "harder for school districts to pass tax referendums." Matthew Albright, *Markell Proposal Could Make School-Tax Votes Tougher*, News J. (Feb. 6, 2015). The article quoted Yvette Johnson, identified as the co-chair of Red Clay's steering committee for the Special Election, as saying she was "not thrilled" about the proposed budget. *Id.* She was further quoted as saying, "If a senior citizen reaches out, I think we just have to explain to them [sic] what's at stake . . . . If this referendum doesn't pass, we could lose after-school activities, the police officers in our schools and other things that are really important." *Id.* According to the article, "Johnson said she was confident Red Clay's referendum would still pass because of the efforts its supporters have made." *Id.*

## B. Red Clay's Get-Out-The-Vote Efforts

To enhance the likelihood that the Special Election would be successful, Red Clay engaged in what its personnel described as "get-out-the-vote" efforts. Red Clay has engaged in similar get-out-the-vote efforts for special elections in the past. Compl. ¶ 32.

On February 18, 2015, Red Clay's superintendent, Mervin B. Daugherty, sent a letter to families with children living in Red Clay. It stated:

> I'm writing today to make you aware of a critical upcoming vote that will have a very direct impact on our children. On Feb. 24, 2015, Red Clay residents will go to the polls and decide whether to increase the operating tax rate by 35 cents over a three-year period. At its height, the increase will mean an additional $23 per month in school taxes for the average Red Clay homeowner.
>
> You may ask, why a Referendum? Believe, us, [sic] raising taxes is about the hardest thing to ask any community but this is the only mechanism for a school district to raise local revenues. About 40% of our district's funding is based on property taxes assessed at 1983 values. It is a near fixed tax base and has not increased since our last referendum in 2008. . . .
>
> As a future Red Clay parent, you have perhaps the largest stake in this referendum and ensuring our schools offer the highest quality education to our children. The operating funds generated by this referendum pay for the people and programs in our schools. They fund classroom teachers and keep our class sizes smaller, fund after school activities and sports, reading and behavior specialists, arts and music programs, library and classroom materials, police officers and security measures in our schools and on our buses. Operating funds pay for the special programs Red Clay is highly regarded for, and so much more. They pay for the very things we are in danger of losing. . . .
>
> I urge you to come to the polls on Feb. 24 from 10 a.m. to 8 p.m. at any Red Clay school and cast a vote for your child's future. Every vote is so important!

Compl. Ex. B. Superintendent Daugherty sent his letter to all families with children living in Red Clay, even if the children were not yet old enough to attend school. Superintendent Daugherty did not send his letter to other voters in the district.

On the day of the Special Election, Superintendent Daugherty used Red Clay's School Messenger notification service to remind families of children attending Red Clay schools to vote in favor of the Special Election. At least some principals of schools in

Red Clay used their schools' automated phone systems to make similar appeals to families to vote. Red Clay has twenty-eight public schools other than charter schools. The plaintiffs have not yet taken discovery, and they do not presently have a factual basis to make allegations about multiple schools, but the Complaint alleges specifically that families of children attending Henry B. du Pont Middle School received a pre-recorded call from the principal asking them to vote in favor of the tax increase. At the pleading stage, it is reasonable to infer that this was not an isolated incident.

All of Red Clay's twenty-eight non-charter public school buildings served as polling places for voting in the Special Election. During the school day, Red Clay took steps to facilitate the ability of older students to vote. At McKean High School, administrators called students who were eighteen years of age or older out of class and took them to the polling location. At Alexis I. du Pont High School, administrators approached students who looked old enough to vote, asked if they were eighteen years of age or older, and encouraged them to vote if they were.

To draw parents and guardians to the schools where voting was taking place, Red Clay scheduled family friendly events at its schools. The events included family fun nights, family bingo nights, activity nights, pizza parties, carnivals, dances, faculty basketball games, and even a free dinner for parents and students at Heritage Middle School. Compl. ¶ 29, Exs. C & F (the "Family-Focused Events").

Nash told the NBC10 news reporter that the Family-Focused Events were "get-out the vote events." Compl. ¶ 23. She noted the events technically were open to voters without children as well, but she qualified her statement by observing, "I don't know that

6

they [*i.e.*, voters without children] would have a desire to come to family bingo night." *Id.* at ¶ 24. At the pleading stage, it is reasonable to infer that Red Clay designed the Family-Focused Events to appeal to families with children, believing that the events would bring them to the polls, and that they comprised a demographic group that would vote in favor of the tax increase.

Red Clay took other steps to encourage voters to vote in favor of the tax proposal. When voters entered Austin D. Baltz Elementary School, signs encouraged them to vote in favor. *Id.* at ¶ 29(e). One sign near the voter entrance stated, "Support the Baltz Bear by voting yes." *Id.*, Ex. C. For its Family-Focused Event, Baltz held a pajama dance party with pizza. Parents stood outside the exit to the polling place and voters a check-off card. The card had three boxes labeled, respectively, "I ate," "I voted," and "I danced." Once the "I voted" box was checked off, the holder was entitled to pizza, popcorn, and sodas. *Id.* At A.I. DuPont Middle School, parents stationed at desks by the entrance told prospective voters that if they did not vote in favor, students would not have after-school activities. *Id.* at ¶ 29(f). The Complaint alleges, and it is reasonable at this stage to infer, that these were not isolated incidents but rather representative of activities conducted throughout the school district.

The Complaint alleges that Red Clay took action to make it difficult or impossible for people with disabilities or reduced mobility to vote. Plaintiff Rebecca Young is a resident of Red Clay. She tried to bring her elderly parents, plaintiffs Elizabeth H. Young and James L. Young, to one of the schools to vote. Rebecca's parents have disabilities that limit their mobility, but she could not park in the spots at the school reserved for

7

handicapped persons, because empty school buses were blocking the spaces. Rebecca and her parents wanted to vote against the tax increase. Ultimately, Rebecca and her parents did not vote because Rebecca was not able to park close enough for her parents to access the polling place, and she did not felt comfortable leaving her parents unattended in her vehicle while she voted.

Other voters encountered similar access issues. *See* Compl. Ex. C. The Complaint alleges that these issues arose because Red Clay scheduled the Family-Focused Events to draw families with children to the schools. The cars driven by attendees of the Family-Focused Events filled up the school parking lots, and the attendees remained at the Family-Focused Events longer than voters would if they were simply stopping by the polling places to vote. The large volume of cars in the school parking lots caused the types of access issues faced by the plaintiffs. They also created the misimpression that the voting lines were long, which dissuaded individuals with mobility issues from voting.

The Complaint alleges generally that Red Clay staff removed from school property signs urging residents to vote against the tax increase. Red Clay staff allegedly left in place signs urging residents to vote in favor of the tax increase.

## C. The Outcome Of The Special Election

Red Clay achieved its goal for the Special Election. The tax increase passed by a vote of 6,395 to 5,515. The winning margin of 880 votes represented approximately 7% of the residents who voted.

The outcome of the Special Election in Red Clay contrasted with the results of a special election conducted on the same day in the Christina school district, which is

adjacent to Red Clay. The Christina school board did not engage in get-out-the-vote activities or other types of electoral interventions. Although the Christina school district has slightly *more* eligible voters than Red Clay, its special election had two-thirds of the turnout that Red Clay achieved: approximately 8,000 residents voted in Christina compared to approximately 12,000 residents who voted in Red Clay.

The Christina school board had proposed two tax increases. Both failed. On the first, 6,076 voters opposed it, and 2,119 voters favored it. On the second, 6,348 voters opposed it, and 1,826 voters favored it. Notably, the number of voters opposing the tax increases in the Christina school district was roughly the same as the number that opposed the tax increase in Red Clay: the special elections in both districts generated approximately 6,000 "no" votes. But in Red Clay, there were many more residents who got out and voted "yes."

**D. Complaints About The Special Election**

The New Castle County Department of Elections received complaints about the conduct of the Special Election both on the day of the vote and afterwards. So did State Senator Karen E. Petersen. Approximately forty residents of Red Clay, including plaintiff Rebecca Young, contacted Senator Petersen to express their concerns.

The complaints were sufficiently numerous that Senator Petersen and several other members of the General Assembly wrote Superintendent Daugherty to question Red Clay's activities. By letter dated March 9, 2015, Superintendent Daugherty provided his answers. Pertinent questions and answers appear below:

**Question 1.** A number of documents presented to us indicate that school activities may have been specifically planned to coincide with the February 24, 2015 election in an attempt to impact the outcome of the vote. We have attached a link to a video invitation for the "Blizzard Blues Beach Bingo" event at the Linden Hill Elementary School which is one such event that constituents have brought to our attention. Is this true? If so, who covered the cost of these events? . . .

We understand that many other schools in the district scheduled and held similar events. We have received complaints about crowded parking lots and other inconveniences for voters trying to reach the polls. Can you please confirm the number of schools that scheduled similar events on February 24? Does the Board provide additional funding for these events or do they come out of each school's budget? Can you provide an approximate district-wide cost of the events that were held in the district on February 24?

**Response to Question 1:** . . . Get out the vote activities were planned at our schools on February 24 as they have been for every referendum. Participation was voluntary and not related to whether or not a constituent voted or how they voted. For example, February is Love to Read month and African American History month so every year we have activities in February celebrating these important events. School events are focused on academic engagement or school or PTO/PTA activities like the Bingo event you noted at Linden Hill. Family Bingo is regularly held at our schools at various times throughout the year. Funding of such programs comes from the building budget or the PTA/PTO as part of their normal budgets. Costs are nominal and no additional funding sources were provided by the district.

\* \* \*

**Question 3:** We have received numerous questions regarding . . . whether the public outreach regarding the election was limited and may not have reached all voters who would be impacted by passage of the referendum. Could you please detail the public outreach, including the number of residents the District contacted during the course of the campaign?

**Response to Question 3:** Public outreach was community wide. In December, 2014 we sent a Red Clay Record with notification of the upcoming Referendum to all households within the District boundary. In February, 2015 we sent a Red Clay Record with detailed information on the [Special Election] again community wide – mailing to more than 74,000 addresses. All information was posted on our district web site. We followed

elections regulations regarding notifications at all our schools and in the Newspaper running consecutive weeks 2/2 through 2/23. In addition we held a number of public meetings and workshops related to the referendum over the past nine months. We answered questions from every media outlet to explain the District's needs and the purposes of the Referendum. It was the News Journal and other media, however, who determined the coverage of the information we provided.

**Question 4:** Finally, constituents have expressed concern that campaign signs supporting the referendum were displayed well within the boundaries established by Delaware State Law that prohibits such activity within 50 feet of a polling place. We have also been told that signs supporting the referendum were located inside the polling places. Can you confirm that this did not occur?

**Response to Question 4:** Conduct of the election was the responsibility of the Delaware Department of Elections ("DOE"). DOE has well-trained and professional staff that supervised and monitored the election. The DOE staff does not permit signs or any conduct that did not comply with Delaware's election laws and procedures.

In addition, school staff was aware of the requirements of campaign signs not being within 50 feet of the polling place. If Red Clay staff saw a sign or other material that they believed did not comply with the election regulations, they brought this information to the attention of the Department of Elections Inspectors who monitor the polling places. We rectified immediately any concern reported to us by the Department of Elections. We were made aware of very few instances of this occurring.

Compl. Ex. A. at 1-3.

The Complaint disputes the accuracy of Superintendent Daugherty's responses. At this procedural stage, it is not possible to weigh the evidence and determine whether one side or the other is correct. The truth may well lie somewhere in between.

C.    **Procedural History**

On March 27, 2015, the plaintiffs filed a verified complaint and moved for an expedited hearing on an application for a preliminary injunction that would block the tax increase from taking effect. I denied the motion to expedite, holding that even if the tax

11

increase went into effect, a post-trial remedy could be crafted in the event the plaintiffs prevailed. Among other possible routes, the statute governing school-related property taxes contains a mechanism for refunding school taxes paid in error. *See* 14 *Del. C.* § 1921. A post-trial remedy also could be achieved by having Red Clay treat the payments that property owners made as a credit against future taxes owed.

On April 13, 2015, the plaintiffs filed the Complaint. Red Clay moved to dismiss it for failing to state a claim on which relief could be granted. Red Clay attached to its reply brief various news articles and a letter in which the Attorney General informed the Department of Elections that the Office of Civil Rights and Public Trust would not be bringing any criminal proceedings relating to conduct that allegedly took place during the Special Election. Dkt. 27, Ex. A. At oral argument, the plaintiffs referenced a subsequent email exchange between the Attorney General and Senator Petersen. Dkt. 33. In that exchange, Senator Peterson expressed her dissatisfaction with the Attorney General's decision, and both Senator Peterson and the Attorney General debated the applicable law. Both sides agreed that the court could consider the news articles, the Attorney General's letter, and the email exchange without converting the motion to dismiss into a motion for summary judgment.

## II.    LEGAL ANALYSIS

Red Clay has moved to dismiss the Complaint pursuant to Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the

12

non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (footnotes and internal quotation marks omitted).

The plaintiffs' theories divide neatly into a claim under federal law and a claim under state law. As their federal theory, they contend that Red Clay violated their rights to due process and equal protection under the law as guaranteed by the Fourteenth Amendment of the United States Constitution.[1] The first section of the Fourteenth Amendment contains one of the most jurisprudentially significant sentences ever crafted: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Within this single sentence appear the Due Process and Equal Protection Clauses, as well as their doctrinally emaciated and underdeveloped cousin, the Privileges & Immunities Clause. The plaintiffs contend that Red Clay personnel violated the two more vigorous clauses. They seek to enforce their rights by suing under 42 U.S.C. § 1983, which states:

---

[1] The Complaint also cited the Due Process Clause of the Fifth Amendment, which provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To the extent the Complaint relies on this federal protection, it is dismissed. The Due Process Clause in the Fifth Amendment applies only to the federal government. *Bolling v. Sharpe*, 347 U.S. 497 (1954). The Complaint does not challenge any action taken by the federal government, only action taken by Red Clay.

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

This statutory section "protects citizens and persons within the jurisdiction of the United States against the deprivation of rights, privileges or immunities *secured by the Constitution and laws of the United States* by persons acting under color of state law."[2] Consequently, the content of the violations that the plaintiffs have alleged under Section 1983 must flow from federal law.

As their state law theory, the plaintiffs contend that Red Clay violated Article I, § 3 of the Delaware Constitution, which states that "[a]ll elections shall be free and equal." Del. Const. art. I, § 3 (the "Elections Clause"). As sources of authority to imbue this clause with meaning for purposes of the particular violations claimed in this case, the plaintiffs point to the prohibitions on electioneering found in 14 *Del. C.* § 1087, and 15 *Del. C.* §§ 4933 and 4942.[3] They also cite the Delaware Equal Accommodation Act, 6

---

[2] *Marker v. Talley*, 502 A.2d 972, 976 (Del. Super. 1985) (emphasis added); *see Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002) ("[Section] 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States."); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989) ("As the language of [Section 1983] plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights.").

[3] It not clear whether the plaintiffs purport to sue directly under the electioneering statutes. To the extent the Complaint could be read to assert such a claim, it is dismissed. Each of the provisions is a criminal statute. Only the Attorney General has authority to

*Del. C.* § 4504, which prohibits discrimination against the aged and disabled.[4] The

plaintiffs regard the Elections Clause as self-executing, such that they can enforce it

directly by way of a private action. Alternatively they invoke Article I, § 9, of the

Delaware Constitution, which states:

> [E]very person for an injury done him or her in his or her reputation, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or

---

bring a criminal proceeding. *E.g.*, *Brett v. Berkowitz*, 706 A.2d 509, 512-13 (Del. 1998) (finding no private right of action under criminal statutes penalizing offensive touching and sexual harassment because "the statutes were enacted, not to create rights for a particular group of citizens, but to protect the public at large").

[4] It is not clear whether the plaintiffs purport to sue directly under 6 *Del. C.* § 4504. To the extent the Complaint could be read to assert such a claim, it is dismissed. *Miller v. Spicer*, 602 A.2d 65, 68 (Del. 1991) ("The [Delaware Equal Accommodation Act] contains no express authorization for the maintenance of a private cause of action and, in our view, no legislative intention to permit such a remedy may be implied from the [Delaware Equal Accommodation Act's] underlying purpose."); *see* Joy Mulholland & Richard H. Morse, *Article I of the Delaware Constitution: Liberty Begins at Home*, Del. Law., 29-WTR Del. Law. 18, 20 (2012) (observing that "the [Equal Accommodation] statute supplies no private right of action, and victims seeking redress under state law may only file complaints before the Human Relations Commission"). As part of the administrative procedure, the statute provides a mechanism by which the Attorney General can seek injunctive relief on a plaintiff's behalf, or the agency can do so through special counsel. *See* 6 *Del. C.* § 4610(e); *State v. Messic*, 1998 WL 671279, at *1 (Del. Ch. Sept. 18, 1998) (discussing procedures). This decision need not consider whether there might be a rare case in which exigent circumstances would call for a court to act before a plaintiff had exhausted the administrative procedures. *Cf. Levinson v. Del. Comp. Rating Bureau, Inc.*, 616 A.2d 1182, 1191-92 (Del. 1992) (explaining that exhaustion of administrative remedies is not required if a prompt decision in the public interest is needed, if the case does not involve administrative expertise or discretion, or if irreparable harm would result).

expense. Suits may be brought against the State, according to such regulations as shall be made by law.[5]

Red Clay has not argued that a private right of action is unavailable, that the Remedies Clause is not applicable, or that the Elections Clause is not self-executing. This decision consequently does not engage those issues.

As the primary basis for its motion to dismiss, Red Clay relies on a two-punch combination. To knock out the federal claim, Red clay argues that it had a constitutionally protected right under the First Amendment to engage in the election-related activity because all of its activities were traditional speech or expressive conduct. To knock out the state law claim, Red Clay contends that the Elections Cause should be

---

[5] Del. Const. art. I, § 9 (the "Remedies Clause"). "Under this section, the courts have a duty to afford a remedy for every substantial wrong; the volume of cases, danger of fraudulent claims, or difficulty of proof do not eliminate this requirement." Holland, *Delaware State Constitution*, *supra,* at 65. Also under this section, "the General Assembly is not permitted to restrict the general historic equity jurisdiction of the Court of Chancery to less than that provided for in the Delaware Constitution of 1792." *Id.* As the Delaware Supreme Court has observed, "[i]t cannot be said too forcefully that the general powers of the Court of Chancery refers to that complete system of equity as administered by the High Court of Chancery of Great Britain." *Glanding v. Indus. Tr. Co.*, 45 A.2d 553, 558 (Del. 1945).

> [T]he Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief.

*Schoon v. Smith*, 953 A.2d 196, 204-05 (Del. 2008) (quoting 1 John Norton Pomeroy, *Equity Jurisprudence* § 60 (Spencer W. Symons ed., 5th ed. 1941)).

interpreted in lockstep with federal law. Red Clay's alleged First Amendment right to engage in electoral activity ends up disposing of both causes of action.

To the extent these arguments do not succeed, Red Clay has two fallback positions. First, Red Clay contends that the Complaint only can state a claim for relief if its allegations support a reasonable inference that the misconduct influenced the outcome of the election. Red Clay argues that the Complaint does not meet this standard. Second, Red Clay contends that the Attorney General already investigated the substance of the plaintiffs' allegations and decided not to bring criminal charges. Red Clay contends that the Attorney General's decision disposes of plaintiffs' civil claims.

This decision starts by identifying the overarching public policy issues raised by this case. It then considers and rejects each of Red Clay's arguments. Having done so, this decision outlines the general contours of the federal and state law claims. Lacking detailed briefing from the parties, those outlines are necessarily tentative and designed only to indicate that the Complaint's theories and allegations are sufficient to survive a motion to dismiss.

## A.    The Public Policy Issues

Before addressing Red Clay's specific arguments for dismissal, it is helpful to step outside the confines of legal doctrine and frame broadly the public policy questions that this case presents. As a general matter, governments must be able to govern effectively, which includes having the ability to express their views about government programs and what constitutes the government's view of the public good. If a government believes it

17

needs more money to govern or to support a particular program, it should be able to inform its citizenry of that fact and explain why.

At the same time, the legitimacy of our republican form of government rests ultimately on the consent of the governed. That consent is renewed regularly through elections. The ability of a government to intervene in an election stands in tension with the election as the legitimizing source of government power. If the government effectively determines the outcome, then the legitimacy of the election is obviously undermined. At the extreme, a government that intervenes to establish and maintain an electoral majority by force, coercion, intimidation, or fear is not a republican form of government. It is totalitarian.

The good news for those living in stable Western democracies is that their governments do not currently establish and enforce electoral majorities through heavy-handed means. But a government that could achieve the same result indirectly by distorting public opinion and manipulating the composition of the voter base would not be any more legitimate, just more savvy and subtle.

It should be obvious that government involvement in the electoral process does not automatically equate to totalitarianism. Government involvement is a matter of degree. A government that intervenes in elections to protect electors and prevent private parties from using force, coercion, bribery, or intimidation does not undermine the legitimacy of the election. That type of government activity enhances the electoral process by making it possible for more electors to participate freely and express their views. Different and more difficult issues arise if a government uses its powers to encourage or facilitate

voting by electors who might be thought to favor the government's positions, or to discourage or interfere with voting by electors who might be thought to oppose the government's views. Along similar lines, a government that provides factual information to voters acts in an election-enhancing capacity. The potential for concern grows as the tenor, volume, and extent of the government's advocacy increases. Whether listeners object may well depend on whether they agree with the substance of the government's views. What one voter might call helpful information, another might label propaganda.

The nature of the decision is also important. Voters generally participate in two types of elections. In one type, voters choose among candidates to determine who comprises the government. In the other type, voters express approval for or disapproval of a referendum or ballot initiative that has been presented to them for decision. In my view, government intervention in the first scenario raises more serious public policy concerns and presents a greater threat of entrenched political power. Government intervention in the second scenario, particularly in the form of traditional speech, seems less dangerous. Some degree of government speech in the second scenario seems desirable as a means of providing information that will enhance decision-making by the electorate.[6]

---

[6] For a scholarly article endorsing this distinction for government election advocacy, see Helen Norton, *Campaign Speech Law with a Twist: When the Government is the Speaker, Not the Regulator*, 61 Emory L.J. 209, 213 (2011) [hereinafter *Campaign Speech*]. Other scholars are more skeptical. *See* Steven J. André, *Government Election Advocacy: Implications of Recent Supreme Court Analysis*, 64 Admin. L. Rev. 835 (2014); Nelson Tebbe, *Government Nonendorsement*, 98 Minn. L. Rev. 648 (2013); Edward H. Ziegler Jr., *Government Speech and the Constitution: The Limits of Official*

As I see it, Red Clay's activities involved at least three gradations of involvement in the electoral process. The least serious is what one scholar has called "government campaign speech." Norton, *Campaign Speech*, *supra*, at 213. This term refers to

> speech to the public (rather than to other government entities) that expresses the official view of a governmental branch or body, such as speech issued collectively in the form of a resolution or proclamation, or speech by an official empowered to speak for that governmental entity. It does not include speech by individual government officials expressing their own views in a personal, nongovernmental capacity—e.g., when a governor endorses a particular candidate for Senate on her own time and without any expenditure of government resources. . . .[7]

Government campaign speech takes a wide variety of forms. "Examples include not only government officials' statements and press releases critical or supportive of pending ballot or legislative measures, but also government agencies' reports and analyses, as well as flyers, pamphlets, newsletter articles, online postings, and print and broadcast advertisements communicating their views of such measures to the public." *Id.* This decision draws a further distinction between government campaign speech that is directed

---

*Partisanship*, 21 B.C. L. Rev. 578 (1980); David P. Haberman, Note, *Governmental Speech in the Democratic Process*, 65 Wash. U. L.Q. 209 (1987); Note, *The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns*, 93 Harv. L. Rev. 535 (1980).

[7] Norton, *Campaign Speech*, *supra*, at 213-14. Norton distinguishes government campaign speech on referenda from government campaign speech in favor of particular candidates and excludes the latter from her definition. *Id.* at 214. I believe the term logically extends to both contexts, although I agree with her that the two scenarios present different policy issues and that government speech during an election involving candidates should be subject to greater restrictions and closer scrutiny.

broadly to the electorate as a whole and targeted government campaign speech, which is directed to identifiable groups within the electorate.

Reasonable minds can disagree about legitimacy of government campaign speech. "[C]ontroversies over such speech include those over the Eisenhower Administration's advocacy on behalf of its proposed health care legislation, state human rights agencies' communications in support of the Equal Rights Amendment, and local school boards' expressive support for school bond measures." *Id.* (footnotes omitted). Critics of government campaign speech point to risks of coercion, the chilling effects on opposition behavior, the potential for the government's louder microphone to drown out or otherwise unfairly disadvantage competing voices, and even the ability of a government to use its regulatory muscle to limit or shut down its opponents. Another concern is that government speech may not be reliable. "The Gulf of Tonkin and the Watergate cover-up are more egregious examples of government efforts to manufacture the consent of the governed." André, *Government Election Advocacy*, *supra*, at 841 n.11. Distortions also may result from well-meaning government officials acting in good faith. "Their investment in a particular ballot measure inevitably predisposes them to be biased, to discount other perspectives, and to slant their approach in discussing it with the voting public. In addition, because they are insulated, they may be mistaken, misinformed or unwittingly primed by institutional forces . . . ." *Id.* These concerns resonate more strongly if the government's message does not disclose its official origins, if listeners are not able to avoid or counter the government's message, or if the audience is a vulnerable segment of the population, such as children or youth. Norton, *supra*, at 238-39.

21

Proponents of government campaign speech identify a countervailing informational benefit. Non-threatening government speech that transparently identifies its source "facilitate[s] participation in democratic self-governance by informing voters of their government's priorities and encouraging the discovery of truth and dissemination of knowledge by adding to the marketplace of ideas." *Id.* at 241. In some situations, such as when voters consider referenda relating to government services, the government agency may be "particularly knowledgeable" and able to provide a "valuable new perspective." *Id.* at 245. In other situations, government speech may counterbalance a disproportionate volume of speech from wealthy private voices. *Id.* at 251. Proponents discount the risks of coercion, observing that individuals are often skeptical of government views. They also question whether the government really possesses the ability to drown out other voices or is uniquely susceptible to error. They point out that all speakers have interests, and any powerful speaker can drown out others. *Id.* at 248.

According to the Complaint, Red Clay engaged in government campaign speech that was broadly directed to the electorate as a whole. Examples include:

- Mailings of the Red Clay Record and postings on the district website.

- Public meetings and workshops.

- Statements to the media.

- Signs in and around the schools, such as the sign at Baltz Elementary that stated, "Support the Baltz Bear by voting yes."

- Parents stationed at schools on the day of the Special Election to encourage voters to support the tax increase, such as the parents at A.I. DuPont Middle School who sat at desks by the entrance and told prospective voters that if they did not vote in favor, students would not have after-school activities.

22

According to the Complaint, Red Clay also engaged in government campaign speech that was not directed to the electorate as a whole but rather to identifiable groups within it. Targeted government campaign speech raises different issues than broadly directed government campaign speech precisely because it involves the government making distinctions among identifiable portions of the electorate. The example cited in the Complaint that falls into this category was Superintendent Daugherty's letter to families with school-aged and pre-school-aged children urging them to vote in favor of the tax increase. Red Clay targeted families with school-aged and pre-school-aged children, believing them to be likely to support the tax increase.

Moving beyond government campaign speech, a second type of government intervention seeks to affect the outcome of the election by shaping the demographic characteristics of those who vote. A government can encourage and facilitate voting by identifiable groups that the government believes will favor its position, or the government can discourage and raise impediments to voting by identifiable groups that the government believes will oppose its position. In my view, this type of intervention is more serious than government campaign speech because it goes beyond attempts to educate and persuade by seeking instead to skew the result that an unaffected turnout would produce. Like targeted campaign speech, it involves the government discriminating among identifiable groups of voters by choosing to favor some and

disfavor others. Recent scholarship and litigation involving this type of government intervention has focused on voter identification statutes.[8]

In this case, Red Clay engaged in selective get-out-the-vote efforts that encouraged and facilitated participation by families with school-aged and pre-school-aged children, an identifiable group that Red Clay believed would favor the tax increase. The Family-Focused Events were the most powerful of the selective get-out-the-vote techniques. Red Clay held these events on the day of the Special Election at all of the schools where there were polling places. They drew parents of children to the polls by providing the families with a tangible reward in the form of food and activities. Although the events nominally were open to everyone, Red Clay recognized that parents without children would not have a desire to attend. *See* Compl. ¶ 24 (Red Clay representative observing that "I don't know that they [*i.e.*, people without children] would have a desire to come to family bingo night"). Because the Family-Focused Events functioned as rewards for voting, this decision analyzes them as a separate category of electoral intervention.

---

[8] *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008); *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015); Spencer Overton, *Voter Identification*, 105 Mich. L. Rev. 631, 633 (2007). A historical example involved the widespread furloughs granted to Union troops so they could return home to vote in the election of 1864. The Lincoln administration believed that the troops would favor the President over his challenger. *See* Eugene R. Gaetke, *Lessons in Legal Ethics from Reading About the Life of Lincoln*, 97 Ky. L.J. 583, 613 (2009) (citing David Herbert Donald, *Lincoln* 454-55 (1955)).

Other selective get-out-the-vote efforts did not operate by providing rewards to an identifiable category of voters. They simply targeted an identifiable group and encouraged them to vote. Examples cited in the Complaint included

- Superintendent Daugherty's use of Red Clay's School Messenger system to remind parents of Red Clay students to vote in favor of the tax increase.

- School principals' use of their schools' automated phone systems to encourage families of students to vote in favor of the tax increase.

- The steps taken at Red Clay high schools to call students who were eighteen or older out of class and have them vote.

The third category of electoral intervention raised in this case is when a government provides rewards for voting to an identifiable group that it believes will support its policies. In my view, this type of electoral incursion is the most serious, because it moves beyond persuasion and encouragement to the point of transferring something of value to a subset of the electorate in return for the act of voting. Conceptually, it resembles a bribe. It also involves the government discriminating among identifiable groups of voters by choosing to favor some and disfavor others. There are scholars who argue that to increase election turnout, governments should be able to provide some form reward for voting to all voters. [9] Several states allow payments for

---

[9] *See* Anthony B. Sanders, *In Defense of Vote Buying: How "Nader Traders" Can Defeat Rent Seeking*, 26 Hamline J. Pub. L. & Pol'y 43 (2004); Richard L. Hasen, *Vote Buying*, 88 Cal. L. Rev. 1323, 1326, 1334 (2000) (arguing that paying rewards to boost turnout would be beneficial when evaluated using norms of equality and efficiency but could pose concerns for community self-governance); Natalie J. Lockwood, *International Vote Buying*, 54 Harv. Int'l L.J. 97, 116 (2013) (arguing that vote buying may be effective in encouraging voter turnout) (citing Simeon Nichter, *Vote Buying or Turnout Buying: Machine Politics and the Secret Ballot*, 102 Am. Pol. Sci. Rev. 19 (2008)).

25

voting, so long as the payment is not designed to induce a voter to favor a particular candidate or result.[10] I have not located authority that favors a government having the ability to provide rewards to a particular subset of the electorate that the government believes will favor its preferred outcome.

Through the Family-Focused Events, Red Clay provided rewards for voting to families with children. The clearest example of a reward for voting was the paper chits at Baltz Elementary School. Voters exiting the polling place encountered individuals handing out check-off cards. The cards had three boxes labeled, respectively, "I ate," "I voted," and "I danced," with the "I voted" box checked off. Once all three boxes were checked, the holder was entitled to pizza, popcorn, and sodas. *See* Compl. Ex. C. Through this system, Red Clay provided something of value (a voucher for food) in return for the act of voting.

The other Family-Focused Events similarly provided something of value in return for voting. For only marginally less straightforward examples, consider the free dinner at Heritage Middle School or the carnivals at other schools. Instead of hosting the dinner and carnivals themselves, the schools could have given families coupons to a local restaurant, arcade, or family fun park. Or in lieu of providing coupons, the schools could

---

[10] *See* Cal. Elec. Code § 18522 (prohibiting any person from providing consideration to a voter to induce or reward the voter to vote for or against a particular candidate, or to refrain from voting generally); *Dansereau v. Ulmer*, 903 P.2d 555, 560 (Alaska 1995) ("Although [Alaska law] prohibits a person from paying another person to vote for a particular candidate, proposition, or question, no Alaska Statute prohibits a person from compensating another person for voting per se."). *See generally* Richard L. Hasen, *Vote Buying*, 88 Calif. L. Rev. 1323, 1355 (2000).

have handed out money and encouraged families to spend it at a local restaurant, arcade, or family fun park. If the schools had handed out coupons or money, then the exchange of something of value for the act of voting would have been readily apparent. By hosting the dinner and carnivals themselves, the schools simplified the exchange by providing the benefits directly.

Interestingly, one could argue that it would have been less problematic if Red Clay had distributed coupons or money. Anyone can use cash, so a direct payment would have incentivized greater overall participation by all voters, including those who might oppose the tax increase. Transferable coupons would have had a similar effect. An elderly couple might not want to go to an arcade or family fun park themselves, but they might appreciate getting their coupons and could pass them along to relatives or friends. Instead, by structuring the rewards as events hosted by the schools that would appeal to families with children, Red Clay transferred something of value to an identifiable group of voters that it believed would support its desired electoral outcome.

By discussing these issues as matters of public policy, I hope to have illustrated the competing values at issue. The role of a court, however, is not to address contestable propositions based on one judge's subjective assessment of the preferred outcome. The role of a court is to evaluate conduct against extant sources of legal authority. To the extent a court interprets authorities in light of public policy, the court's task is to look externally for legitimate sources of guidance, such as constitutional and legislative enactments, or established lines of common law authority.

The remainder of this decision undertakes these tasks for purposes of a pleading-stage analysis of the plaintiffs' claims. For reasons it will discuss, if Red Clay only had engaged in broadly directed government campaign speech, then the Complaint would not state a claim under federal law. The challenges to certain categories of Red Clay's campaign speech state a claim under state law, but only because they were conducted on the day of the election in close proximity to the polling places where voting was taking place, and because it is reasonably conceivable that the tone, manner, and content of these communications crossed a line established by the Delaware Supreme Court in *Brennan v. Black*, 104 A.2d 777 (Del. 1954).

For similar reasons, although targeted government campaign speech presents closer questions under federal and state law, it seems unlikely to me that Superintendent Daugherty's letter ultimately will be proven to be problematic. For pleading purposes, however, the plaintiffs' challenge to Superintendent Daugherty's letter states a claim under federal and state precedent.

Red Clay's targeted get-out-the-vote efforts also present close questions under federal and state law. As with Red Clay's targeted government campaign speech (which it resembles), it seems unlikely to me that Red Clay's use of established methods of communicating with parents, such as the School Messenger system or the automated phone calls, ultimately will be proven to violate state and federal law, and it seems reasonable that Red Clay gave voting-aged students an opportunity to vote during the school day, rather than requiring them to vote after school was over. At the pleading stage, however, the plaintiffs have stated a claim.

In my view, the targeted rewards for voting do not present close questions for pleading-stage analysis under federal or state law. Whether or not the plaintiffs can prevail at a later stage will depend on what discovery reveals and the defenses that Red Clay presents. For present purposes, the challenge to this type of conduct states a claim.

## B.    Red Clay's Election Interventions As Constitutionally Protected Speech

The plaintiffs contend that Red Clay's interventions in the Special Election violated both the United States Constitution and the Delaware Constitution. Red Clay has responded with the equivalent of an affirmative defense: the Complaint should be dismissed as a matter of law because all of the conduct it identifies involved Red Clay engaging in constitutionally protected speech.

According to Red Clay, "the District has a constitutionally protected right to advocate for or against a matter within its governance functions, including a tax referendum." Red Clay Op. Br. at 9-10. In its reply brief, Red Clay relied specifically on its "First Amendment right to advocate" and asserted that "governmental entities are protected by the First Amendment." Red Clay Reply Br. at 9. At oral argument, Red Clay's counsel stood by these contentions. Dkt. 35 at 6-12. Moreover, as Red Clay sees it, the United States Supreme Court has equated the expenditure of money with speech.[11]

---

[11] *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 314, 350 (2010); *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam); Daniel J. Oates, *Franchisor Political Speech: The Disclosure Question*, 34 Franchise L.J. 555, 569 n.3 (2015) (collecting authority and discussing debate about whether money is speech); Marion McLane Read, Note, *Between A* Rock *and A Hard Place: Looking Beyond Statutes and the First Amendment to Address Ethical Concerns in Federal Lobbying*, 24 Geo. J. Legal Ethics

Consequently, Red Clay believes that the Free Speech Clause protects not only traditional speech like Superintendent Daugherty's letter, but also its expressive conduct, such as the Family-Focused Events, that involved using Red Clay's facilities and spending its funds. Although I agree that the government speech doctrine applies to Red Clay, I do not believe that the Free Speech Clause protects Red Clay, nor that it operates as a form of constitutional immunity against claims grounded in other sources of law.

The Free Speech Clause famously states that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. 1. By its plain terms, the Free Speech Clause imposes a limit on the government; it does not grant protection to the government.[12] As the United States Supreme Court has written, "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). Instead, "[t]he involvement of public officials in advocacy may be limited by law, regulation, or practice." *Id.* at 468. The "law" includes the United States Constitution: "[E]ven if the Free Speech Clause neither restricts nor protects government speech,

_____

783, 790-91 (2011) (arguing that *Citizens United* and *Buckley* stand for the proposition that "spending money is speech").

[12] *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 139 (1973) (Stewart, J., concurring) ("The First Amendment protects the press *from* government interference; it confers no analogous protection *on* the government.") (emphases added); *see also* Bob Burns, *Remarks on the South Dakota Law Review Symposium: The Government Speech Doctrine*, 57 S.D. L. Rev. 394, 396 (2012) (noting that the "First Amendment was intended to limit national governmental powers and not to augment or enhance governmental powers").

government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses." *Id.* at 482 (Stevens, J., concurring). For state government actors like Red Clay, the "law" includes the state constitution and other sources of state law. *See Cook v. Baca*, 95 F.Supp.2d 1215, 1227 & n.18 (D.N.M. 2000) (rejecting Free Speech Clause challenge while noting that courts often enforced state law limits on government campaign speech).

To justify its assertion of constitutionally protected speech, Red Clay relies on cases applying the "recently minted" government speech doctrine. *Summum*, 555 U.S. at 481 (Stevens, J., concurring). As I understand it, the government speech doctrine does not rewrite the Free Speech Clause to protect government speech, nor does it create a defense to other limitations on government speech that the law might impose. It rather protects the government's own speech from claims that a plaintiff otherwise might raise under the Free Speech Clause. It particularly addresses two recurring claims: first, a viewpoint-discrimination claim in which a plaintiff argues that once the government establishes a forum for speech, the government must remain neutral and cannot engage in viewpoint discrimination, and second, a compelled-subsidy claim in which a plaintiff argues that by spending taxpayer funds or other government moneys in support of a particular program, the government is compelling the plaintiff to subsidize speech with which the plaintiff disagrees. In response to these species of claims, the United States Supreme Court held in *Summum* that if government entities are "engaging in their own expressive conduct, then the Free Speech Clause has no application." *Id.* at 467. Having "no application" is

different than providing affirmative constitutional protection for government speech or a complete defense against other limitations on government conduct.

The decision in *Rust v. Sullivan*, 500 U.S. 173 (1991), provides an example of the government speech doctrine operating to defeat a viewpoint-discrimination claim. The Secretary of Health and Human Services adopted regulations pursuant to Section 1008 of the Public Health Service Act, which forbade the use of federal funds "in programs where abortion is a method of family planning." *Id.* at 178 (citing 42 U.S.C. § 300a-6). The petitioners challenged the regulations as "impermissibly discriminating based on viewpoint" in violation of the Free Speech Clause. *Id.* at 192. The United States Supreme Court disagreed.

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.[13]

---

[13] *Id.* at 193. The Supreme Court reasoned similarly but reached a different conclusion in *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). There, a public university collected money through mandatory student activity fees, which it used to print student publications. The university refused to pay the printing costs of a student-written religious publication. Those students sued, arguing that the university abridged their First Amendment rights under the Free Speech Clause. The United States Supreme Court affirmed its holding in *Rust*, but held that on the facts presented in *Rosenberger*, the university had undertaken to fund the speech of all student groups on campus, effectively creating the equivalent of a public form. The Court nevertheless cautioned that "[a] holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." *Id.* at 834. For a similar case granting relief on a compelled-speech claim, see *Bd. of Regents of University of Wis. Sys. v. Southworth*, 529 U.S. 217, 223, 229-30 (2000), where the Court held that a mandatory activity fee that was used for student publications forced students to engage in

Selective funding was an appropriate means by which the government could "ensure that the limits of the federal program are observed." *Rust*, 500 U.S. at 193.

The decision in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), provides an example of the government speech doctrine operating to defeat a compelled-subsidy claim. The plaintiffs challenged a USDA program that spent funds raised through an assessment on cattle sales on generic advertising for beef products.[14] The plaintiffs argued that the program violated the Free Speech Clause by forcing them to subsidize speech with which they disagreed. The United States Supreme Court upheld the assessment and the use of the proceeds for advertising. The decision explained that "[t]he message of the promotional campaigns [was] effectively controlled by the Federal Government itself" and that "'[c]ompelled support of government'—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest. And some government programs involve, or entirely consist of, advocating a position." 544 U.S. at 559-60. The Court concluded that "[c]itizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech." *Id.* at 562.

---

compelled speech, but cautioned that "[w]here the University speaks, either in its own name through its regents or officers, or in myriad other ways through its diverse faculties, the analysis likely would be altogether different." *Id.* at 235.

[14] *Id.* at 553. *Livestock Marketing* was the third in a string of similar cases that challenged industry-specific assessments used for general advertising purposes. *See United States v. United Foods, Inc.*, 533 U.S. 405 (2001); *Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457 (1997).

Federal and state decisions have relied on the government speech doctrine to reject Free Speech Clause challenges to government campaign speech.[15] The plaintiffs in these cases challenged government campaign speech by invoking the Free Speech Clause. They did not challenge government electoral interventions by invoking *other limitations on the government's ability to speak or act*, such as the Due Process Clause and Equal Protection Clauses of the Fourteenth Amendment or various provisions of state law.

A leading decision, on which Red Clay relies heavily, is *Kidwell*. That case focused on a disputed ballot initiative relating to the creation and funding of a fire department for the City of Union. 462 F.3d at 622. The city council opposed a citizen-sponsored resolution to create a fire department for the city and used public funds to

[15] *See Page v. Lexington Cty. Sch. Dist. One*, 531 F.3d 275, 281 (4th Cir. 2008) (rejecting viewpoint-discrimination challenge to school district's advocacy against proposed tax credit); *Kidwell v. City of Union*, 462 F.3d 620, 626 (6th Cir. 2006) (rejecting compelled-subsidy and viewpoint-discrimination challenges to city's advocacy against a ballot initiative); *Adams v. Maine Mun. Ass'n*, 2013 WL 9246553, at *22 (D. Me. Feb. 14, 2013) (rejecting compelled-subsidy challenge to lobbying efforts by firm that represented association of municipalities); *Cook v. Baca*, 95 F. Supp. 2d 1215, 1227-29 (D.N.M. 2000) (rejecting viewpoint-discrimination challenge to advertisement in favor of ballot initiative that mayor had included with utility bills), *aff'd*, 2001 WL 303679 (10th Cir. Mar. 29, 2001); *Lash v. City of Union*, 104 F. Supp. 2d 866, 876 (S.D. Ohio 1999) (analyzing compelled-subsidy challenge to City's use of money to promote tax levy); *Ala. Libertarian Party v. City of Birmingham*, 694 F. Supp. 814, 817-21 (N.D. Ala. 1988) (rejecting compelled-subsidy challenge to city's promotional campaign in favor of bond issue and new tax levy); *Peraica v. Riverside-Brookfield High Sch. Dist.*, 999 N.E.2d 399, 407-09 (Ill. App. Ct. 2013) (relying on government speech doctrine to dismiss compelled-subsidy and viewpoint-discrimination challenges to a school district's efforts in support of a tax referendum); *Montgomery Cty. v. Fraternal Order of Police*, 112 A.3d 1052, 1070, 1074 (Md. Ct. Spec. App. 2015) (rejecting compelled-subsidy challenge to county's expenditure of funds to promote its position on a ballot measure), *cert. granted*, 2015 WL 5109169 (Md. Aug. 21, 2015). *See generally* André, *Government Election Advocacy*, *supra*, at 843-44.

campaign against it. The city hung "Vote NO" banners, mailed leaflets to residents, bought advertising in local newspapers, and used the town newsletter to express its opposition. *Id.* at 622-23. Voters who supported the initiative asserted two Free Speech Clause violations. They claimed that the city had engaged in viewpoint discrimination by denying them access to a public forum (the town newsletter and town treasury), and they argued that the city had forced them to engage in compelled speech by using public funds to disseminate a message with which they did not agree. *Id.* at 623.

The United States Court of Appeals for the Sixth Circuit affirmed the entry of summary judgment against the plaintiffs. As to the viewpoint-discrimination claim, the court noted that the plaintiffs had not shown that they had asked for and been refused access to the town newsletter or that any other private group was permitted access. The court rejected the plaintiffs' argument that they could access the town newsletter by relying on a United States Supreme Court case which held that "[w]hen government property is not dedicated to open communication the government may—without further justification—restrict use to those who participate in the forum's official business." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 53 (1983)). The court likewise rejected the argument that the town treasury was a public forum and held that the city's advocacy had not converted it into one: "To hold that Union's advocacy converts its treasury to a public forum . . . would be tantamount to a heckler's veto, where the government could not speak for fear of opening its treasury to the public." *Id.* at 624.

35

As to the compelled-speech claim, the court relied on the government speech doctrine as articulated in *Livestock Marketing*. The *Kidwell* opinion acknowledged that "elections raise unique constitutional issues because they are the very foundation of a democratic system [and that] where the government uses its official voice in an attempt to affect the identity of the people's elected representatives, it can undermine its legitimacy as a champion of the people's will and thereby subvert one of the principles underlying democratic society." *Id.* at 625. The court nevertheless held that the plaintiffs could not mount a compelled-subsidy challenge:

> Although these principles require some limit on the government's power to advocate during elections, they do not support a bright line rule barring such speech, at least where the government speaks within the scope of its governance functions.
>
> Governments must serve their citizens in myriad ways, including by provision of emergency services, and those activities require funding through taxation. . . . The issues on which the city advocated were thus germane to the mechanics of its function, and are clearly distinguishable from the hypothetical cases of government speech in support of particular candidates . . . .
>
> The natural outcome of government speech is that some constituents will be displeased by the stance that their government has taken. Displeasure does not necessarily equal unconstitutional compulsion, however, and in most cases the electoral process—not First Amendment litigation—is the appropriate recourse for such displeasure.

*Id.* at 625-26 (footnotes omitted). As this discussion of *Kidwell* shows, the court of appeals addressed claims that invoked the Free Speech Clause itself as a limitation on government speech, not claims that relied on other sources of law.[16]

To the same effect is *Page*, a decision rendered in 2008 by the United States Court of Appeals for the Fourth Circuit. A school district in South Carolina used its "website, e-mail, and other forms of communication" to lobby the state legislature against granting a tax credit to families who home-schooled their children or sent them to private schools. 531 F.3d at 277. An individual who supported the tax credit asked the school district to allow him to use its "informational distribution system" to speak in favor of the bill. *Id.* After the school district denied his request, he filed suit alleging that the school district had violated his rights under the Free Speech Clause by engaging in viewpoint discrimination. *Id.* at 278.

Reasoning that the school district was engaging in government speech, the court of appeals affirmed a grant of summary judgment against the plaintiff. The court held that the school district had a justifiable interest in "defend[ing] public education in the face of pending legislation that it views as potentially threatening of public education." *Id.* at 287. Elaborating, the court stated, "just as we accept that government may adopt policies for all of the people, even if a policy is against the wishes of some, it may also advocate

---

[16] Illustrating the sensitivity of government interventions in elections, even when the only challenges arise under the Free Speech Clause, *Kidwell* was a split decision that prompted a lengthy, vigorous, and scholarly dissent. *See id.* at 626-37 (Martin, J., dissenting).

in favor of those policies." *Id.* at 281. The court cautioned, however, an allowance for government campaign speech "does not suggest that government can suppress opposing views." *Id.*

As exemplified by *Kidwell* and *Page*, the government speech doctrine responds to Free Speech Clause claims. It "does not mean that there are no restraints on government speech." *Summum*, 555 U.S. at 468. The questions posed by this case are whether Red Clay has violated (i) federal limitations imposed by the Due Process and Equal Protection Clauses or (ii) state limitations imposed by the Elections Clause. Red Clay cannot respond to those claims by arguing that it has a constitutionally protected right to speak. Whether the Complaint states a claim must be analyzed under the provisions in the federal and state constitutions that the plaintiffs have invoked.

## C.     The Relationship Between The Federal And State Claims

Having argued that its electoral interventions were protected by the government speech doctrine, Red Clay next contends that the plaintiffs do not possess a separate claim under state law that is distinct from their claim under federal law. Red Clay reaches this conclusion by contending that the Elections Clause in the Delaware Constitution should be interpreted in lockstep with federal jurisprudence applying the government speech doctrine. To support the argument for constitutional equivalency, Red Clay relies on a single decision from the Pennsylvania Supreme Court that embraced the lockstep approach.

In my view, Red Clay is trebly wrong. The equivalency argument fails initially because the government speech doctrine only responds to Free Speech Clause claims. It

does not provide a defense to a claim under sources of law, such as state law. The equivalency argument fails a second time because the ostensible federal parallel for the Elections Clause is not the Free Speech Clause and cases applying the government speech doctrine, but rather the federal regime of implied constitutional protection for voting rights that has developed under the Due Process and Equal Protection Clauses. The equivalency argument fails yet again because the Elections Clause in the Delaware Constitution is both separate from and more protective of electoral rights than the implied federal regime.

Commentators have identified several models that state courts use when analyzing the relationship between state and federal constitutional protections.[17] The lockstep model rests on the proposition that "a state constitutional provision with an analogous federal counterpart should be construed precisely the same way." Holland, *Purpose & Function*, *supra*, at 18. Under this model, "changes or clarifications of federal law by the United States Supreme Court lead to parallel changes in state constitutional law."[18] The

---

[17] *See* Randy J. Holland, *State Constitutions: Purpose and Function* [hereinafter *Purpose & Function*], *in The Delaware Constitution of 1897: The First One Hundred Years* 5, 18 (Randy J. Holland & Harvey Bernard Rubenstein eds., 1997) [hereinafter, *First 100 Years*]. For a discussion of these approaches that focuses on voting provisions in state constitutions, see Joshua A. Douglas, *The Right to Vote Under State Constitutions*, 67 Vand. L. Rev. 89 (2014) [hereinafter *State Constitutions*].

[18] Earl M. Maltz, *False Prophet—Justice Brennan and the Theory of State Constitutional Law*, 15 Hastings Const. L.Q. 429, 437-38 (1988); *see* John Christopher Anderson, *The Mysterious Lockstep Doctrine and the Future of Judicial Federalism in Illinois*, 44 Loy. U. Chi. L.J. 965, 966-71 (2013) (discussing lockstep and judicial federalism debate); James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 761, 788-792 (1992) (analyzing lockstep doctrine and collecting cases).

interstitial model gives federal law priority by first analyzing a claim under the United States Constitution. If the federal right addresses the issue, then the analysis stops. Only if the federal right leaves a gap will a court determine whether the state constitution fills it.[19] The primacy model takes the opposite view. It treats a state constitution as "an independent source of rights and relies on it as the fundamental law."[20]

---

[19] Holland, *Purpose & Function*, *supra*, at 18; *accord* Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues When Disposing of Cases on State Constitutional Grounds*, 63 Tex. L. Rev. 1025, 1047-50 (1985).

[20] Utter, *supra*, at 1028. Other approaches have been identified, and an extensive literature has developed on the subject. *See, e.g.*, Lawrence Friedman, *The Constitutional Value of Dialogue and the New Judicial Federalism*, 28 Hastings Const. L.Q. 93 (2000) (collecting cases and scholarship and analyzing debate on various state constitutional interpretive approaches); Shirley S. Abrahamson, *State Constitutional Law, New Judicial Federalism, and the Rehnquist Court*, 51 Clev. St. L. Rev. 339 (2004); Anderson, *The Mysterious Lockstep Doctrine and the Future of Judicial Federalism in Illinois*, *supra*; John Kincaid, *Foreword: The New Federalism Context of the New Judicial Federalism*, 26 Rutgers L.J. 913 (1995); Article, *Developments in the Law – The Interpretation of State Constitutional Rights*, 95 Harv. L. Rev. 1324 (1982); Lawrence Friedman & Charles H. Baron, Baker v. State *and the Promise of the New Judicial Federalism*, 43 B.C. L. Rev. 125 (2001); James A. Gardner, *State Constitutional Rights as Resistance to National Power: Toward a Functional Theory of State Constitutions*, 91 Geo. L.J. 1003 (2003); Matthew C. Jones, *Fraud and the Franchise: The Pennsylvania Constitution's "Free and Equal Election" Clause as an Independent Basis for State and Local Election Challenges*, 68 Temp. L. Rev. 1473 (1995); Timothy P. O'Neill, *Escape from Freedom: Why "Limited Lockstep" Betrays our System of Federalism*, 48 J. Marshall L. Rev. 325 (2014); Michael Schwaiger, *Understanding the Unoriginal: Indeterminate Originalism and Independent Interpretation of the Alaska Constitution*, 22 Alaska L. Rev. 293 (2005); Diane S. Sykes, *The "New Federalism": Confessions of a Former State Supreme Court Justice*, 38 Okla. L. Rev. 367 (2013); Elisabeth A. Archer, Note, *Establishing Principled Interpretation Standards in Iowa's Cruel and Unusual Punishment Jurisprudence*, 100 Iowa L. Rev. 323 (2014).

These interpretive models are generalizations, and the Delaware Supreme Court has not embraced any of them exclusively. The Delaware Supreme Court instead has held that a court must "apply a logical, deductive analytical process" to determine whether a state constitutional provision should be given the same interpretation as "*similar* language in the United States Constitution." *Jones v. State*, 745 A.2d 856, 864 (Del. 1999). Relying on an influential concurring opinion by Justice Handler of the New Jersey Supreme Court, the *Jones* decision identified a "partial list of . . . non-exclusive criteria" that could be used in the analysis. *Id.* They include:

(1) Textual Language—A state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law. Textual language can be relevant in either of two contexts. First, distinctive provisions of our State charter may recognize rights not identified in the federal constitution. . . .

Second, the phrasing of a particular provision in our charter may be so significantly different from the language used to address the same subject in the federal Constitution that we can feel free to interpret our provision on an independent basis . . . .

(2) Legislative History—Whether or not the textual language of a given provision is different from that found in the federal Constitution, legislative history may reveal an intention that will support reading the provision independently of federal law. . . .

(3) Preexisting State Law—Previously established bodies of state law may also suggest distinctive state constitutional rights. State law is often responsive to concerns long before they are addressed by constitutional claims. Such preexisting law can help to define the scope of the constitutional right later established.

(4) Structural Differences—Differences in structure between the federal and state constitutions might also provide a basis for rejecting the constraints of federal doctrine at the state level. The United States Constitution is a grant of enumerated powers to the federal government. Our State Constitution, on the other hand, serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected

41

representatives. Hence, the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them.

(5) Matters of Particular State Interest or Local Concern—A state constitution may also be employed to address matters of peculiar state interest or local concern. When particular questions are local in character and do not appear to require a uniform national policy, they are ripe for decision under state law. Moreover, some matters are uniquely appropriate for independent state action. . . .

(6) State Traditions—A state's history and traditions may also provide a basis for the independent application of its constitution . . . .

(7) Public Attitudes—Distinctive attitudes of a state's citizenry may also furnish grounds to expand constitutional rights under state charters. While we have never cited this criterion in our decisions, courts in other jurisdictions have pointed to public attitudes as a relevant factor in their deliberations.

*Id.* at 864-865 (alterations in original; quoting *State v. Hunt*, 450 A.2d 952, 965-66 (N.J. 1982) (Handler, J., concurring)). Continuing to quote from Justice Handler's concurrence, the Delaware Supreme Court noted that these factors "share a common thread—that distinctive and identifiable attributes of a state government, its laws and its people justify recourse to the state constitution as an independent source for recognizing and protecting individual rights." *Id.* at 865 (internal quotation marks omitted).

Depending on the clauses in question and the situation presented, a Delaware court may well hold that a provision of the Delaware Constitution should be interpreted in lockstep with a similarly worded federal provision.[21] It seems fair to say, however, that

---

[21] *See Gen. Elec. Co. v. Klein*, 106 A.2d 206, 210 (Del. 1954) (interpreting language in Article I, § 7 of the Delaware Constitution in parallel with the due process clause found in the Fifth Amendment of the United States Constitution); *Whitwell v. Archmere Acad., Inc.*, 2008 WL 1735370, at *2 (Del. Super. Apr. 16, 2008) (observing

Delaware jurisprudence generally favors the primacy model and resists the lockstep model.[22] Skepticism about lockstep interpretations is particularly strong for provisions which, like the Elections Clause, appear in Delaware's Declaration of Rights. *See generally* Randy J. Holland, *The Delaware State Constitution* 32-34 (2011).

---

that when evaluating a claim for deprivation of a right without due process of law, Delaware follows the lock-step approach); *Bailey v. City of Wilmington,* 1999 WL 1442006, at *3 (Del. Super. Dec. 22, 1999) (same), *aff'd,* 766 A.2d 477 (Del. 2001) (per curiam). *See generally Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1259 (Del. 2011) ("Delaware constitutional due process is coextensive with federal due process.").

[22] *See, e.g.*, *Doe v. Wilm. Hous. Auth.*, 88 A.3d 654, 665 (Del. 2014) (finding Delaware's right to keep and bear arms found in Article I, § 20 of the Delaware Constitution grants broader rights than the Second Amendment of the United States Constitution); *Jones*, 745 A.2d at 860-61, 863 (holding that Article I, § 6 of the Delaware Constitution provides greater rights against unlawful searches and seizures than the Fourth Amendment of the United States Constitution); *Claudio v. State*, 585 A.2d 1278, 1298 (Del. 1991) (holding that Article I, § 4 of the Delaware Constitution provides a greater right to trial by jury in a criminal matter than the Sixth Amendment of the United States Constitution); *Bryan v. State*, 571 A.2d 170, 176 (Del. 1990) (holding that Article I, § 7 of the Delaware Constitution provides greater rights to counsel than the Fifth Amendment of the United States Constitution); *Hammond v. State*, 569 A.2d 81, 87 (Del. 1989) (holding that Article I, § 7 of the Delaware Constitution provided greater protections in the preservation of evidence used against a defendant than the Fourteenth Amendment of the United States Constitution); *Van Arsdall v. State*, 524 A.2d 3, 6-7 (Del. 1987) (holding that Article I, § 7 of the Delaware Constitution contemplated a greater right of confrontation than the Sixth Amendment of the United States Constitution); *see also Fortt v. State*, 766 A.2d 475 (Del. 2000) (per curiam) ("While the analysis may be the same under either the federal or state [double jeopardy] provision, Delaware's distinct common law roots developed prior to the adoption of the Fifth Amendment of the Federal constitution do not preclude a separate analysis in given circumstances without reference to the federal counterpart."); *Lolly v. State*, 611 A.2d 956, 959-60 (Del. 1992) (declining to follow federal due process cases and holding that bad faith by the policy in failing to preserve exculpatory evidence is not a prerequisite to a lack of due process under the Delaware Constitution).

> The Declaration of Rights in the Delaware Constitution is not a mirror image of the federal Bill of Rights. Consequently, Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in "lock step" with the United States Supreme Court's construction of the federal Bill of Rights.

*Dorsey v. State*, 761 A.2d 807, 814 (Del. 2000) (footnote omitted); *see Sanders v. State*, 585 A.2d 117, 145-46 (Del. 1990) ("If we were to hold that our Constitution is simply a mirror image of the Federal Constitution, we would be relinquishing an important incident of this State's sovereignty. In a very real sense, Delaware would become less of a State than its sister States who recognize the independent significance of their Constitutions.").

Underlying this skepticism is a coherent judicial philosophy based on federalism and dual sovereignty.[23] As the *Jones* court observed, "[t]he Framers of the United States Constitution adopted a constitutionally mandated balance of power between the states and the Federal Government to ensure the protection of our fundamental liberties." 745 A.2d at 874 (internal quotation marks omitted). "The preservation of diversity in the legal and governmental systems of each state was expressly contemplated when the United States Constitution was framed and adopted." *Id.* Consequently, "[t]he Delaware

---

[23] *See* William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1977) ("State constitutions . . . are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law."); *id.* at 502 ("[T]he decisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law."). *See generally* Holland, *Delaware State Constitution*, *supra*, at 33-34; Myron T. Steele & Peter I. Tsoflias, *Realigning the Constitutional Pendulum*, 77 Alb. L. Rev. 1365, 1374-75 (2014).

Constitution, like the constitutions of certain other states, may provide individuals with greater rights than those afforded by the United States Constitution."[24] Put simply, "[s]tate charters are the foundations of American constitutional law." Holland, *Purpose & Function*, *supra*, at 5.

In this case, a review of the factors suggested in *Jones* leads me to conclude that the Elections Clause should not be interpreted in lockstep with the federal jurisprudence that has developed under the Fourteenth Amendment. The Elections Clause has independent content that is more protective of electoral rights than the federal regime.

### 1. Textual Language

As the *Jones* court observed, "[a] state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law." 745 A.2d at 864. The Elections Clause fits within the first category provided by the *Jones* court: "distinctive provisions . . . [that] recognize rights not identified in the federal constitution." *Id.*

Unlike the Delaware Constitution and those of forty-eight other states, the United States Constitution does not explicitly provide an individual with a right to vote.[25]

---

[24] *Id.* at 863; *accord California v. Ramos,* 463 U.S. 992, 1013-14 (1983) ("It is elementary that States are free to provide greater protections . . . than the [f]ederal Constitution requires."). *See generally* Steele & Tsoflias, *supra.*

[25] Douglas, *State Constitutions*, *supra*, at 95; *accord* Hannah Tokerud, *The Right of Suffrage in Montana: Voting Protections Under The State Constitution*, 74 Mont. L. Rev. 417, 417 (2013) ("[T]he federal constitution does not expressly grant the people the right to vote."); James A. Gardner, *Devolution and the Paradox of Democratic Unresponsiveness*, 40 S. Tex. L. Rev. 759, 763 (1999) ("[T]he United States Constitution

Recognizing this fact, the United States Supreme Court has observed that "the [federal] Constitution 'does not confer the right of suffrage upon any one,' and 'the right to vote, *per se*, is not a constitutionally protected right.'"[26] Two provisions in the federal constitution defer explicitly to the states to set criteria for voting. Article I, § 2 provides that in electing members of the United States House of Representatives, "Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. The Seventeenth Amendment uses the same structure for determining who can vote to elect United States Senators. U.S. Const. amend. XVII.

It is true that the United States Supreme Court has recognized an implied right to vote, but the Court derived that right from a combination of (i) the Due Process and Equal Protection Clauses of the Fourteenth Amendment[27] and (ii) the prohibitions against

---

does not establish any constitutional substantive right to vote—not even for offices required by the Constitution to be filled by popular election . . . ."). The outlier among the states is the Arizona Constitution, which provides that "[n]o person shall be entitled to vote . . . unless" certain criteria are met. Douglas, *State Constitutions*, *supra*, at 102 n.83 (quoting Ariz. Const. art. VII, § 2).

[26] *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982) (quoting *Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 178 (1874), and *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973); *accord see, e.g., Fontham v. McKeithen*, 336 F. Supp. 153, 156 (E.D. La. 1971) (observing, before recognition of federal right to vote under Fourteenth Amendment, that "[t]here is no federal constitutional right to vote in State and local elections").

[27] *See Bush v. Gore*, 531 U.S. 98, 104 (2000) ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the Electoral College. . . . When the state

specific types of disenfranchisement found in other amendments, each of which identifies a basis on which voting rights "shall not be denied."[28] An implied right is not the same thing as an express right.

The United States Constitution also does not contain an explicit guarantee of free elections. The closest that the United States Constitution comes is the Guarantee Clause, which provides that "[t]he United States shall guarantee to every state in this Union a Republican Form of Government." U.S. Const. art. V, § 4, cl. 1. The United States Supreme Court generally has declined to enforce the Guarantee Clause, holding that whether a particular governmental system satisfied the Guarantee Clause presented a

---

legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental. . . . The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors."); *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). Earlier United States Supreme Court decisions did not cite a particular constitutional provision but rather derived the right from overarching democratic principles. *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (holding that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government"); *Baker v. Carr*, 369 U.S. 186, 208 (1962) (stating that "[a] citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). In addition to the Equal Protection Clause, the Fourteenth Amendment contains a "Reduction in Representation" clause which provides that if a state restricts the individuals who can vote, then it loses representation in its Congressional delegation. U.S. Const. amend. XIV, § 2. This clause also defers to state law to determine who can vote.

[28] U.S. Const. amends. XV (race), XIX (gender), XXIV (ability to pay a poll tax), XXVI (age).

political question for Congress.[29]

Unlike the United States Constitution, the Delaware Constitution contains the Elections Clause. "There is a dearth of case law addressing [the Elections Clause]," but the few decisions that have addressed it appear to have regarded the provision as having substantive content.[30] Admittedly these cases did not deal directly with the question of lockstep interpretation.

The constitutions of twenty-five other states include a constitutional provision stating that elections shall be "free," "free and equal," or "free and open."[31] Although the *Jones* court did not identify decisions from other jurisdictions explicitly as one of the factors to be considered, the Delaware Supreme Court in *Jones* did look to decisions from other states. The *Jones* decision explained its rationale as follows:

> The United States Constitution establishes a system of dual sovereignty: a federal government and state governments. That system has horizontal and vertical aspects. Vertical federalism binds the states to the will of the

---

[29] *See generally Baker*, 369 U.S. at 217-18; *Luther v. Borden*, 48 U.S. 1, 42 (1849); Gardner, *supra*, at 764.

[30] *Abbott v. Gordon*, 2008 WL 821522, at *19 (Del. Super. Mar. 27, 2008) ("[T]he limited case law that does exist indicates that this section's purpose is to ensure that the right of citizens to vote in an election is unfettered."); *State ex rel. James v. Battersby*, 56 A.2d 527, 531-32 (Del. Super. 1947) (considering challenge to election results based on Elections Clause where public official failed to take steps to assess and collect capitation or poll tax, resulting in some citizens being denied the right to vote).

[31] Douglas, *State Constitutions*, *supra*, at 103. The states other than Delaware are Arizona, Arkansas, Colorado, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, and Wyoming.

federal sovereign government with regard to the enumerated powers that have been surrendered. Horizontal federalism permits the states to look to the jurisprudence of sister states in defining the sovereign powers that have been reserved for state governments.

745 A.2d 856, 866-67 (Del. 1999) (footnote omitted). In this case, the "jurisprudence of sister states" supports giving the Elections Clause independent content, as numerous other state courts have done.[32] States with particularly well developed bodies of

---

[32] *See*, *e.g.*, *Chavez v. Brewer*, 214 P.3d 397, 407-08 (Ariz. Ct. App. 2009); *Whitley v. Cranford*, 119 S.W.3d 28, 31-32 (Ark. 2003); *Moran v. Carlstrom*, 775 P.2d 1176, 1180 (Colo. 1989) (en banc); *People v. Stapleton*, 247 P. 1062, 1064 (Colo. 1926) (en banc); *Neelley v. Farr*, 158 P. 458, 467-68 (Colo. 1916) (en banc); *Littlejohn v. People ex rel. Desch*, 121 P. 159, 162 (Colo. 1912); *People ex rel. Miller v. Tool*, 86 P. 224, 226-27 (Colo. 1905); *League of Women Voters of Ind., Inc.,. v. Rokita*, 929 N.E.2d 758, 763-67 (Ind. 2010); *State Election Bd. v. Bartolomei*, 434 N.E.2d 74, 78 (Ind. 1982) (per curiam); *Oviatt v. Behme*, 147 N.E.2d 897, 900-01 (Ind. 1958); *Johnson v. May*, 203 S.W.2d 37, 38-39 (Ky. 1947); *State Bd. of Elections v. Snyder ex rel. Snyder*, 76 A.3d 1110, 1128 (Md. 2013); *Burruss v. Bd. of Cnty. Commissioners of Frederick Cnty.*, 46 A.3d 1182, 1201 (Md. 2012); *Nader for President 2004 v. Maryland State Bd. of Elections*, 926 A.2d 199, 210 (Md. 2007); *Maryland Green Party v. Maryland Bd. of Elections*, 832 A.2d 214, 228 (Md. 2003); *Munsell v. Hennegan*, 31 A.2d 640, 644 (Md. 1943) *Jackson v. Norris*, 195 A. 576, 594-95 (Md. 1937); *Kemp v. Owens*, 24 A. 606, 608 (Md. 1892); *Santana v. Registrars of Voters*, 425 N.E.2d 745, 750 (Mass. 1981); *Anderson v. City of Boston*, 380 N.E.2d 628, 638 (Mass. 1978); *Bowe v. Sec'y of the Commonwealth*, 69 N.E.2d 115, 127-28 (Mass. 1946); *Weinschenk v. State*, 203 S.W.3d 201, 211-12 (Mo. 2006) (per curiam); *Kasten v. Guth*, 375 S.W.2d 110, 114 (Mo. 1964); *Preisler v. City of St. Louis*, 322 S.W.2d 748, 753 (Mo. 1959); *Willems v. State*, 325 P.3d 1204, 1210 (Mont. 2014); *State ex rel. Nelson v. Marsh*, 243 N.W. 277, 278 (Neb. 1932); *Libertarian Party N.H. v. State*, 910 A.2d 1276, 1280-81 (N.H. 2006); *Gunaji v. Macias*, 31 P.3d 1008, 1016 (N.M. 2001); *Richardson v. Gregg*, 290 P. 190, 193 (Okla. 1930) (per curiam); *Libertarian Party of Or. v. Roberts*, 750 P.2d 1147, 1152 (Or. 1988); *Burt v. Blumenauer*, 699 P.2d 168, 175 (Or. 1985); *Ladd v. Holmes*, 66 P. 714, 718 (Or. 1901); *Applewhite v. Commonwealth*, 2014 WL 184988, at *18 (Pa. Commw. Ct. Jan. 17, 2014); *Cothran v. W. Dunklin Pub. Sch. Dist. No. 1-C*, 200 S.E. 95, 97 (S.C. 1938); *Chamberlin v. Wood*, 88 N.W. 109, 110 (S.D. 1901); *Crutchfield v. Collins*, 607 S.W.2d 478, 480-81 (Tenn. Ct. App. 1980); *Anderson v. Cook*, 130 P.2d. 278, 285 (Utah 1942) (per curiam); *Brigham v. State*, 692 A.2d 384, 394 (Vt. 1997) (per curiam); *State ex rel. Onstine v.*

jurisprudence giving independent content to these clauses include Illinois[33] and Kentucky.[34]

By citing decisions from other jurisdictions, this opinion does not mean to suggest that they uniformly support relief on the facts presented in this case. As one might expect, the various state courts that have interpreted and applied their Elections Clauses agree on some issues and differ on others. Further complicating matters, courts in jurisdictions that have given independent meaning to their states' Elections Clauses sometimes hold that the protection provided by state law parallels the federal law regime as to a particular issue.[35] Nevertheless, the decisions from other jurisdictions show that state courts can and

---

*Bartlett*, 230 P. 636, 638-39 (Wash. 1924); *State ex rel. Voiles v. Johnson Cty. High Sch.*, 5 P.2d 255, 258 (Wyo. 1931).

[33] *See, e.g.*, *Thompson v. Conti*, 233 N.E.2d 351, 354-55 (Ill. 1968); *Moran v. Bowley*, 179 N.E. 526, 531 (Ill. 1932); *People ex rel. Lindstrand v. Emmerson*, 165 N.E. 217, 220 (Ill. 1929); *Emery v. Hennessy*, 162 N.E. 835, 837 (Ill. 1928); *McAlpine v. Dimick*, 157 N.E. 235, 238 (Ill. 1927); *Rouse v. Thompson*, 81 N.E. 1109, 1122-23 (Ill. 1907); *People v. Hoffman*, 5 N.E. 596, 600-01 (Ill. 1886); *Orr v. Edgar*, 670 N.E.2d 1243, 1252 (Ill. App. Ct. 1996); *Ross v. Kozubowski*, 538 N.E.2d 623, 627 (Ill. App. Ct. 1989); *Goree v. LaVelle*, 523 N.E.2d 1078, 1080-81 (Ill. App. Ct. 1988).

[34] *See Johnson v. May*, 203 S.W.2d 37, 38-39 (Ky. 1947); *Asher v. Arnett*, 132 S.W.2d 772, 776 (Ky. 1939); *Taylor v. Neutzel*, 295 S.W. 873, 875, 883 (Ky. 1927); *Wallbrecht v. Ingram*, 176 S.W. 1022, 1026-27 (Ky. 1915); *Upton v Knuckles*, 470 S.W.2d 822, 827 (Ky. Ct. App. 1971); *Gross v. West*, 283 S.W.2d 358, 361 (Ky. Ct. App. 1955).

[35] For example, the Supreme Court of Colorado has given independent meaning to the Colorado Elections Clause. *See, e.g. Moran*, 775 P.2d at 1180; *Neelley*, 158 P. at 467-68. Despite these and other precedents, when confronting a claim that a statute which required persons serving as election judges to be affiliated with one of the two major political parties, the Colorado Supreme Court declined to construe provisions of Colorado's state constitution, including its Elections Clause, as providing greater

50

do enforce their Elections Clauses, and that they frequently give their clauses content independent of federal law.

As its sole authority for asserting that Delaware's Elections Clause has no independent meaning, Red Clay relied on *Erfer v. Commonwealth*, 794 A.2d 325 (Pa. 2002), which Red Clay interprets as holding that Pennsylvania always applies a lockstep approach to its Elections Clause. Because the drafters of Delaware's Elections Clause used Pennsylvania's as one of their models, *see infra* Part C.2.b, Red Clay contends that Delaware's Elections Clause should be interpreted in lockstep with federal law. Unlike Red Clay, I read *Erfer* as an example of a court holding that the protection provided by state law as to a particular issue parallels the federal law regime, not as an expansive ruling that Pennsylvania's Elections Clause lacks independent meaning.

The petitioners in *Erfer* claimed that a reapportionment scheme constituted illegal gerrymandering that violated Pennsylvania's Elections Clause. 794 A.2d at 328. The Pennsylvania Supreme Court rejected this argument. Because *Erfer* is Red Clay's only authority for the lockstep approach, it is worth quoting the decision at some length.

> The crux of this dispute is whether Petitioners have established that Act 1 constitutes unconstitutional political gerrymandering in violation of the equal protection guarantee, Pa. Const. art. 1, §§ 1 and 26, and the free and equal elections clause, Pa. Const. art. 1, § 5. . . .

---

protection than federal law. *See MacGuire v. Houston*, 717 P.2d 948, 955 (Colo. 1986) (en banc). Relying on *MacGuire*, a Colorado trial court subsequently chose to evaluate a challenge to a voter identification requirement solely under federal law and not separately under state law. *See Colorado Common Cause v. Davidson*, 2004 WL 2360485, at *4 (Colo. Dist. Ct. Oct. 18, 2004).

This court did not always recognize that a claim of political gerrymandering was cognizable under the Pennsylvania Constitution. This court changed tack, however, in our unanimous decision *In re 1991 Reapportionment* . . . and recognized that a litigant could raise claims that a reapportionment plan effected a political gerrymander and thus violated the U.S. and Pennsylvania Constitutions. This new view on the justiciability of political gerrymandering claims was predicated on the U.S. Supreme Court's decision in *Davis v. Bandemer*, . . . wherein the Court held that such claims were cognizable as a violation of the Equal Protection Clause.

Once having determined that the claim was justiciable, the next task for the *1991 Reapportionment* court was to define the contours of the test for determining whether unconstitutional political gerrymandering had occurred. Unfortunately, a majority of the *Bandemer* Court was unable to agree on the parameters of such a test. While the *Bandemer* Court issued no holding on this point, the *1991 Reapportionment* court opted to follow the test set forth by the *Bandemer* plurality. The *1991 Reapportionment* court then proceeded to utilize the test set forth by the *Bandemer* plurality to resolve both federal and state constitutional political gerrymandering claims.

In resolving Petitioners' claim that Act 1 is a political gerrymander in violation of the Pennsylvania Constitution, we will continue the precedent enunciated in *1991 Reapportionment* and apply the test set forth by the *Bandemer* plurality. We reject Petitioners' arguments that we should declare that the right to vote guaranteed by our Commonwealth's Constitution provides broader protections than those guaranteed by the federal Equal Protection Clause. We come to this conclusion for two reasons. First, to the extent that Petitioners' gerrymandering claim is predicated on the equal protection guarantee contained in Pa. Const. art. 1, §§ 1 and 26, this court has previously determined that this right is coterminous with its federal counterpart. Second, we reject Petitioners' claim that the Pennsylvania Constitution's free and equal elections clause provides further protection to the right to vote than does the Equal Protection Clause. Petitioners provide us with no persuasive argument as to why we should, at this juncture, interpret our constitution in such a fashion that the right to vote is more expansive than the guarantee found in the federal constitution.

*Id.* at 331-32 (internal citations omitted). As this extended quotation shows, the thrust of

*Erfer* was to stick with the method for analyzing gerrymandering claims that the

Pennsylvania Supreme Court adopted in *1991 Reapportionment*. The court declined to switch to a new analytical methodology, whether as a matter of due process, equal protection, or the "free elections" clause. To the extent *Erfer* declined to give independent meaning to Pennsylvania's Elections Clause, it was in this context.

Outside of a claim for gerrymandering, the Pennsylvania Supreme Court has given independent meaning to the Commonwealth's Elections Clause. Over a century before *Erfer*, a more venerable decision recognized that the clause had independent content in the course of rejecting a claim that a statute calling for a secret ballot violated it:

> The act provides for a secret ballot. That is manifestly its main purpose, and it is in entire harmony with article 1, § 5, Const., which declares that "elections shall be free and equal." This means that every citizen shall have an equal right to cast a free ballot. This is the letter of the constitution, and it is a right which no legislature can interfere with. The spirit of the constitution requires that each voter shall be permitted to cast a free and unintimidated ballot. This the act of 1891 was intended to secure. An election, to be free, must be without coercion of every description. An election may be held in strict accordance with every legal requirement as to form, yet if, in point of fact, the voter casts the ballot as the result of intimidation; if he is deterred from the exercise of his free will by means of any influence whatever, although there be neither violence nor physical coercion,—it is not a free and equal election, within the spirit of the constitution. The framers of the act in question have evidently reached the conclusion that the only adequate guaranty of free and equal elections, within the letter and spirit of the constitution, is absolute secrecy. They therefore have provided a secret ballot.

*De Walt v. Bartley*, 24 A. 185, 186 (Pa. 1892).

Ten years after *Erfer*, the Pennsylvania Supreme Court again gave independent content to the Commonwealth's Elections Clause. *See Applewhite v. Commonwealth of Pennsylvania*, 54 A.3d 1, 3-4 (Pa. 2012). In *Applewhite*, various plaintiffs sought an injunction against a recently implemented voter identification law, arguing that it would

53

prevent qualified and eligible electors from voting in violation of the Elections Clause because the voters would not have enough time to learn about the law's requirements and obtain the necessary identification. *Id.* The plaintiffs accepted that the voter identification law was valid in the abstract, but argued that it was being implemented in a manner that denied Pennsylvanians their fundamental right of suffrage under the Elections Clause. The trial court denied the injunction, but the Pennsylvania Supreme Court reversed the denial and remanded the case so the trial court could consider the issue further. In doing so, the Pennsylvania Supreme Court

> agree[d] with Appellants' essential position that if a statute violates constitutional norms [*viz.*, the Elections Clause] in the short term, a facial challenge may be sustainable even though the statute might validly be enforced at some time in the future. Indeed, the most judicious remedy, in such a circumstance, is the entry of a preliminary injunction, which may moot further controversy as the constitutional impediments dissipate.

*Id.* at 5. On remand, the trial court entered a limited injunction. *See Applewhite v. Pennsylvania*, 2012 WL 4497211, at *8 (Pa. Commw. Ct. Oct. 2, 2012). The *Applewhite* undercuts Red Clay's claim that *Erfer* irrefutably embraced a lockstep interpretation. *Applewhite* instead supports the view that *Erfer*'s lockstep approach applied only to political gerrymandering claims.

Regardless, what matters most for present purposes is that *Erfer* did not conduct the type of multi-factor analysis mandated by the Delaware Supreme Court in *Jones*. The two-sentence adoption of a lockstep approach in *Erfer* effectively accomplished for purposes of Pennsylvania law what the Delaware Supreme Court has told me I cannot do for purposes of Delaware law: "Delaware judges cannot faithfully discharge the

54

responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in 'lock step' with the United States Supreme Court's construction of the federal Bill of Rights."[36]

In my view, the presence of the Elections Clause in the Delaware Constitution provides powerful support under *Jones* for giving it meaning independent of federal law.

### 2. Legislative History

The second factor identified by the *Jones* court was legislative history. 745 A.2d 856, 864 (Del. 1999). The legislative history of the Elections Clause is largely co-terminous with the development of the Delaware Constitution. *See id.* at 865-66.

Delaware has had four constitutions, adopted respectively in 1776, 1792, 1831, and 1897. The last continues in force today. They are not separate and independent, but rather linked. After the adoption of the first constitution in 1776, "[e]ach subsequent Delaware constitution has provided for a revision of the existing government rather than making a fundamental change." Maurice A. Hartnett, III, *Delaware's Charters and Prior Constitutions*, *in First One Hundred Years*, *supra*, 23, 23 [hereinafter, *Delaware's Charters*]. The current Delaware Constitution reflects "a 'layering' of the concerns of successive generations." Holland, *Purpose & Function*, *supra*, at 19 (quoting Robert F. Williams, *State Constitutional Law: Cases & Materials* 19 (2d ed. 1993)). In some cases

---

[36] *Dorsey v. State*, 761 A.2d 807, 814 (Del. 2000). One commentator has argued that Pennsylvania's Elections Clause should have independent content. *See* Matthew C. Jones, *Fraud and the Franchise: The Pennsylvania Constitution's "Free and Equal Election" Clause as an Independent Basis for State and Local Election Challenges*, 68 Temp. L. Rev. 1473 (1995).

the layering is explicit. For example, the current Delaware Constitution addresses trial by jury by stating that it "shall be as heretofore." Del. Const. art. I, § 4.

### a. The Constitution Of 1776

The antecedents of the Elections Clause can be seen in Delaware's first constitution. "In May of 1776, the Continental Congress passed a resolution that advised the colonies to form new governments." Holland, *Purpose & Function*, *supra*, at 5. The general sovereignty exercised by the English monarchy became vested in the former colonies, and as new sovereign entities, the states drafted their own constitutions. *Id.* "A widespread concern before the Declaration of Independence had been a desire for popular control over the process of governing." *Id.* at 6. The Constitutional Convention that convened in New Castle in August 1776 began by drafting a Declaration of Rights and Fundamental Rules of the Delaware State (the "Declaration of Rights"), which the delegates adopted on September 11, 1776. The Declaration of Rights emphasized the role of the people and the importance of elections. Section 1 stated that "all government of right originates from the people, is founded in compact only, and instituted solely for the good of the whole." Section 6 contained a predecessor to the Elections Clause and stated that "the right in the people to participate in the Legislature, is the foundation of liberty and of all free government, and for this end all elections ought to be free and frequent."

Delaware's first constitution, adopted on September 20, 1776, incorporated the Declaration of Rights by reference. Hartnett, *Delaware's Charters*, *supra*, at 28. Affirming the continuing significance of the Declaration of Rights, Article 30 of the Constitution of 1776 stated: "No article of the declaration of rights and fundamental rules

of this state, agreed to by this convention, . . . ought ever to be violated on any pretence whatever." Del. Const. of 1776 art. 30. The Constitution of 1776 also included a specific provision to preserve free elections:

> To prevent any violence or force being used at the said elections, no persons shall come armed to any of them; and no muster of the militia shall be made on that day; nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter who offers to vote objects thereto; nor shall any battalion or company in the pay of the Continent, or of this or any other state, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed, so as in any manner to impede the freely and conveniently carrying on the said election: *Provided always*, That every elector may in a peaceable and orderly manner give his vote on the said day of election.

*Id.* art. 28.

### b. The Constitution Of 1792

The Elections Clause that appears in the current Delaware Constitution took shape in the Constitution of 1792. This constitution "became the basic framework for Delaware's government for more than a century, until the adoption of the current constitution in 1897." Holland, *Delaware State Constitution, supra*, at 11.

After the ratification of the United States Constitution, states began the process of re-writing their own constitutions. Delaware's Constitutional Convention took place in two sessions, one in 1791 and a second in 1792. *Id.* at 10-11. The final product "resembled in some ways the federal constitution because of the presence of John Dickson and Richard Bassett, who had served as members of the Philadelphia

Convention, and because the members were familiar with the federal constitution."[37] But the drafters did not follow the federal constitution in all things. In particular, they "reaffirmed [Delaware's] commitment to its own declaration of rights and common law traditions." Holland, *Purpose & Function*, *supra*, at 14.

Most significantly for present purposes, the drafters of the Constitution of 1792 prepared a new declaration of rights. They drew on the new federal bill of rights. Hartnett, *Delaware's Charters*, *supra*, at 37. They also drew on the Constitution of Pennsylvania of 1791. *Jones*, 745 A.2d at 866. "Almost every aspect of the 1792 Bill of Rights has a corresponding provision in the Pennsylvania constitution. Eighteen of the nineteen provisions of Delaware's 1792 Bill of Rights are nearly identical to provisions in Pennsylvania's 1790 Declaration of Rights." Rodman Ward Jr. & Paul J. Lockwood, *Bill of Rights Article I*, *in First 100 Years*, *supra*, 75, 77 [hereinafter *Bill of Rights*]. The Elections Clause is one of those provisions.

### c. The Constitution Of 1897

We jump next to the Constitution of 1897. The intervening Constitution of 1831 made relatively minor changes to the Constitution of 1792, which principally involved reorganizing the judiciary. Holland, *Delaware State Constitution*, *supra*, 12-13. That 1831 Constitution is thus "better seen as a modification of the 1792 Constitution." *Id.* at

---

[37] *Jones*, 745 A.2d at 866 (quoting Claudia Bushman, et al., *Proceedings of the House of Assembly of the Delaware State 1781-1792 and of the Constitutional Convention of 1972* 36-37 (1988)); *see also Claudio v. State*, 585 A.2d 1278, 1291-98 (Del. 1991); Holland, *Delaware State Constitution*, *supra*, at 11.

15. It was the Constitution of 1897 that established the framework for Delaware's current system.

After the Civil War, there was renewed interest in the structure and operation of state government. "Between 1864 and 1879, thirty-seven new state constitutions were written and ratified." Holland, *Purpose & Function*, *supra*, at 18. Concern about the legitimacy of state and local elections played a significant role in the prompting Delaware to convene a constitutional convention in 1896.[38] "[E]lections and election politics, which had been a powerful impetus for calling the convention, were never far from the

---

[38] *See*, *e.g.*, Holland, *Delaware State Constitution*, *supra*, at 24 ("[R]eforming the political system had helped spur calls for the convention. Vote buying and election fraud were considered rampant."); William H. Williams, *Delaware in the 1890s*, *in First 100 Years*, *supra*, 47, 53 (describing the decade of the 1890s as "probably the most politically corrupt in the state's history"); Henry R. Horsey, et al., *The Delaware Constitutional Convention of 1897*, *in First 100 Years*, *supra*, 57, 58 (noting that in the years leading up to the Constitutional Convention of 1896-97, "abuse of the poll tax and rampant vote-buying threatened to undermine the foundations of representative government"); Ward & Lockwood, *Bill of Rights*, *supra*, at 80 ("The delegates at the 1897 Convention met in the shadow of a very recent history of election bribery in the state."); Joseph T Walsh & Thomas J. Fitzpatrick, Jr., *Judiciary: Article IV*, *in First 100 Years*, *supra*, 123, 123 ("The period immediately preceding the convention was noted by some historians as a time of political scandal, particularly in the election process."). John Edward Addicks's quest to obtain a seat in the United States Senate was the spark that lit the flame of reform. Horsey, *Delaware Constitutional Convention of 1897*, *supra*, at 63-64; Williams, *Delaware in the 1800s*, *supra*, at 52-53; Ward & Lockwood, *Bill of Rights*, *supra*, at 80-81. For an account of Addicks's corruption, see John A. Murone, *History of Delaware* 175-78 (5th ed. 2006) and 1 *Delaware: A History of the First State* 305-06 (H. Clay Reed ed., 1947). For a description of election fraud in Kent County during the elections of 1896, see 1 Henry C. Conrad, *History of the State of Delaware* 236 (1908). An initial challenge to the refusal by the board of canvass to consider the allegations led to the decision in *McCoy v. State*, 36 A. 81 (Del. 1897). Coincidentally, this court relied on *McCoy* in a companion decision that granted the motion to dismiss filed by the Department of Elections in this case. *See Young v. Red Clay Consol. Sch. Dist.*, C.A. No. 10847-VCL (Del. Ch. Oct. 2, 2015).

[delegates'] minds."[39] Consistent with this focus, one of the standing committees that the Convention established was a Committee on the Purity of the Ballot.[40]

Despite their focus on electoral issues, the delegates did not make changes to the Elections Clause. They revered the Declaration of Rights, and they "had no intention of altering a bill of rights that was by then nearly one hundred years old" and which they acknowledged to have developed "out of the long and unique heritage of the English common law and the history of Delaware."[41] The report from the committee charged with reviewing the Declaration of Rights stated:

> This [Declaration of Rights] is regarded, astonishingly and with great unanimity, by the Members of the Convention, as almost the same document. Gentlemen of the Convention are so earnest and anxious that they may transmit this valuable relic of the former centuries to their children and grand-children, and they might point to themselves with pride, that they have left it simply intact, scarcely a dot from the *i* or a cross from the *t* being omitted.

4 *Debates and Proceedings of the Constitutional Convention of the State of Delaware* 2386 (1958). Rather than changing the Declaration of Rights, the delegates addressed elections elsewhere in the new constitution.

---

[39] Horsey, *Delaware Constitutional Convention of 1897*, *supra*, at 61; *see id.* at 62 ("Another of the convention's primary concerns was to rescue the state's election process from the rampant fraud which pervaded elections in the Reconstruction period.").

[40] Ward Jr. & Lockwood, *Bill of Rights*, *supra*, at 81; Horsey, *Delaware Constitutional Convention of 1897*, *supra*, at 61.

[41] Ward & Lockwood, *Bill of Rights*, *supra*, at 78; *accord* Holland, *Delaware State Constitution*, *supra*, at 32.

Two key provisions became §§ 7 and 8 of Article V of the Constitution of 1897.[42] Article V, § 7 defined substantive election offenses and fixed the penalties for violations, including for vote-buying, bribery of election officers, voter intimidation, and malfeasance by election officers. It stated:

> Every person who either in or out of the State shall receive or except, or offer to receive or except, or offer to receive or accept or shall pay, transfer or deliver, or offer or promise to pay, transfer or deliver, or shall contribute, or offer or promise to contribute, to another to be paid or used, any money or other valuable thing as a compensation inducement or reward for the giving or withholding, or in any manner influencing the giving or withholding, a vote at any general, special, or municipal election in this State, or at any primary election, convention or meeting held for the purpose of nominating any candidate or candidates to be voted for at such general, special or municipal election; or who either in or out of the State shall make or become directly or indirectly a party to any bet or wager depending upon the result of any such general, special, municipal or primary election or convention or meeting, or upon a vote thereat by any person; or who either in or out of the State, shall, by the use or promise of money or valuable thing, or otherwise, cause or attempt to cause any officer of election or registration officer to violate his official duty; or who either in or out of the State shall by the use or promise of money or other valuable thing influence or attempt to influence any person to be registered or abstain from being registered; or who, being an officer, of election or registration officer, shall knowingly and willfully violate his official duty; or who shall by force, threat, menace or intimidation, prevent or hinder, or attempt to prevent or hinder, any person qualified for registration from being registered or any person qualified to vote from being registered or any person qualified to vote from voting according to his choice at any such general, special or municipal election, shall be deemed guilty of a misdemeanor, and shall be fined not less than one hundred dollars nor more than five thousand dollars, or shall be imprisoned for a term not less than one month nor more than three years . . .; and, if a male, shall further for a term of ten years next following his sentence be incapable of voting at any

---

[42] Horsey, *Delaware Constitutional Convention of 1897*, *supra*, at 64; Ward & Lockwood, *Bill of Rights*, *supra*, at 80-81.

such general, special, municipal or primary election or convention or meeting . . . .

Del. Const. art. V, § 7 (amended 1999) (the "Anti-Bribery Clause").

The breadth of the Anti-Bribery Clause reflected the "practices of early nineteenth-century politicians who roused their followers to partisan enthusiasm with plentiful and free liquid requirements." Munroe, *supra*, at 173.

> Since the voter had to be a taxpayer, the candidate who had money was tempted to help a poor but faithful supporter by paying his tax bill. He might go a bit further, by giving him a drink of liquor and perhaps two dollars. Sometimes a hat, a coat, or a pair of boots would do as a gift, or a dress for a man's wife.

*Id.* Another path for corruption was the Voters' Assistant Law of 1891, which was intended to provide a legitimate service for illiterate or otherwise handicapped voters by authorizing each political party to provide a voters' assistant in a polling place who could help a voter who asked in marking his ballot. In practice,

> [t]he voter who wanted to sell his vote would request assistance in marking his ballot. When he had properly marked and deposited his ballot, he would be given some token as a sort of receipt for his vote, along with instructions as to where to find the party treasurer, who would exchange an agreed sum for the token. In one case that became notorious because it was described in a court of law, the payoff token was a salted chestnut, handed at the polls to a voter who would then exchange it for his payoff-usually five or ten dollars—at a nearby livery stable.[43]

---

[43] *Id.*; *see* Horsey, *Delaware Constitutional Convention of 1897*, *supra*, at 63 (explaining that "a candidate or party could pay the tax for a voter who would not otherwise qualify (or could simply provide the voter with a falsified tax receipt)" and that "it was common practice to provide citizens with a tax receipt, together with a pre-marked ballot and perhaps a drink or other small gift once the duty was performed").

To address these practices, the Anti-Bribery Clause made it a constitutional criminal offence to use "money or other valuable thing" to "influenc[e]" voting or as a "compensation, inducement or reward" for voting. Del. Const. art. V, § 7

As discussed in the next section, statutes proscribing bribery in elections already existed in Delaware. The Anti-Bribery Clause elevated those prohibitions to a constitutional offense. At the same time, Article V, § 8 removed the right of jury trial for the constitutionalized criminal offenses. "Although it seems to be little more than a historical anecdote today, Article V, § 8 may have been the most vigorously debated section of the 1897 Constitution."[44] The delegates resisted limiting the fundamental right to trial by jury, but they ultimately regarded the step as a necessity:

> Most of the delegates believed that elections were being bought. They also believed that the criminal justice system could not control the problem because juries were unwilling to convict in political cases. One delegate suggested that nine out of ten times the jury would not convict a person guilty of election fraud.

Ward & Lockwood, *Bill of Rights*, *supra*, at 80 (footnotes omitted) (citing 1 *Debates and Proceedings of the Constitutional Convention of the State of Delaware* 503 (1958)). In addition, Section 1 authorized the General Assembly to "prescribe the means, methods and instruments of voting so as best to . . . prevent fraud, corruption and intimidation threat." Del. Const. art. V, § 1.

---

[44] Ward & Lockwood, *Bill of Rights*, *supra*, at 80; *see id.* at 81-82; Walsh & Fitzpatrick, *Judiciary*, *supra*, at 126 (describing Article V, § 6 as "a source of much debate in the convention").

Viewed as a whole, the evolution of the Delaware Constitution from 1776 until 1897 evidences consistent concern for the integrity of the electoral process. Particularly during the Constitutional Convention of 1896-97, the delegates sought to re-establish free and open elections. Although the delegates did not revise the Elections Clause, which was part of the Declaration of Rights, they added other provisions to the Delaware Constitution that evidence a heightened sensitivity to outside influences on voters. The history of Delaware's Elections Clause supports giving it independent meaning.

### 3.    Pre-Existing State Law

As its third factor, the *Jones* court referred to "[p]reviously established bodies of state law," which may "suggest distinctive state constitutional rights" and "can help define the scope of the constitutional right later established." 745 A.2d 856, 864 (Del. 1999). For purposes of this case, this decision looks to Delaware law at the time of the Constitutional Convention of 1896-97, when the Elections Clause was last considered and the Anti-Bribery Clause introduced.

When the delegates gathered for the Constitutional Convention of 1896-97, Delaware already banned forms of electioneering, including providing items of value in returns for votes. The pre-1897 anti-bribery statute stated:

> If any person shall give, offer or promise any money, goods, chattles [sic] or other thing or matter . . . by way of bribe, gift, benefit or reward, for the purpose, or with the object of influencing any elector in giving his vote, or in refusing to vote, or in absenting himself from the polls at any election [or candidate . . . shall, for every such offense, forfeit and pay the sum of two hundred dollars, one-half thereof to be for the use of the State, and the other half thereof for the person who will sue for the said penalty; and further, any person or candidate so offending, shall be deemed guilty of a misdemeanor.

*Del. C. 1852*, § 313. The statute notably authorized a private right of action and incentivized enforcement by providing a successful litigant with the ability to split the $200 penalty with the State.

Another relevant pre-1897 statute was titled, "An Act Further to Protect the Free Exercise of the Elective Franchise." Section 1 of that state stated

> That if any person who is a duly qualified elector of this State, according to the Constitution and the Laws thereof, shall hereafter be prevented from voting, or obstructed in his effort to vote at any election, by reason of any interference by any person or persons . . . exercising or attempting to exercise force, intimidation or threats, or requiring any qualifications or conditions unknown to such Constitution and Laws, he shall be deemed and taken to have suffered private damage and injury, and shall have civil remedy therefor, in the Courts of this State by action of trespass, or on the case, according to the nature of the interference, against all and every person or persons who promote such interference, whether by active participation, or by advising, counseling, or in any wise encouraging the same; and in any trial under this act, the jury, if, in their opinion the circumstances will warrant it, may give exemplary damages.

12 Del. Laws ch. 487, § 1 (1864). This statute also contemplated a private right of action. Of particular interest, the statute of limitations for a claim under the act was set at a quite-lengthy ten years, allowing plenty of time for post-election challenges. *Id.* at § 3. Both provisions were part of a broader statutory scheme that sought to ensure the integrity of elections.[45]

---

[45] *See, e.g., Del. C. 1852*, § 307 (making it a misdemeanor for justices of the peace, collectors, and constables who "refuse or neglect to perform the duties by this section"); *id.* at § 309 (imposing fine on any "inspector, collector, assessor, or other presiding officer, judge," "clerk" "a clerk of the peace, sheriff, coroner, prothonotary, or other officer presiding at a board of canvass" for neglect of duty or "misbehavior" in performing duties); *id.* at 310 (misdemeanor for presiding officer or judge who knowingly receives unlawful votes); *id.* at § 311 (misdemeanor for fraud in producing

Despite the existence of these statutes, the delegates to the Constitutional Convention of 1896-97 regarded the integrity of elections as a serious problem. Through the Anti-Bribery Clause, they made it a constitutional criminal office to provide "any money or other valuable thing" as a "compensation, inducement or reward" for voting. Del. Const. art. V, § 7. But for their reverence for the Declaration of Rights, they might well have expanded on the Elections Clause itself. The fact that the delegates to the Constitutional Convention of 1896-97 sought to promote the integrity of elections notwithstanding the statutes already on the books suggests that they intended for the Delaware Constitution to provide distinctive protections for voting.

### 4.      Structural Differences

For its fourth factor, the *Jones* court observed that "[d]ifferences in structure between the federal and state constitutions" may provide a basis for interpreting a state constitutional protection differently. 745 A.2d at 864. Unlike the United States Constitution, which is "a grant of enumerated powers to the federal government," the Delaware Constitution "serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives." *Id.* Consequently, "the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them." *Id.*

---

certificate of election). It also established penalties for inappropriate voter behavior. *Id.* at § 312 (misdemeanor for illegal voting); *id.* at § 313 (misdemeanor for bribery); *id.* at § 314 (civil fines for betting on election); *id.* at § 316 (civil and criminal penalties for breaches of the peace); *id.* at § 317 (civil penalties for selling liquor within two miles of a polling place).

In this case, the structural distinction has particular salience in light of the important role that the declarations of rights in state constitutions long played in protecting fundamental freedoms. At the time of the ratification of the United States Constitution in 1787, the declarations of rights in state constitutions were paramount. When the movement to add a bill of rights to the federal constitution began during the debates in September 1787, opponents argued that a federal bill of rights was unnecessary because "the State Declarations of Rights are not repealed by this Constitution . . . and being in force are sufficient." 2 *The Records of the Federal Convention of 1787*, at 588 (M. Farrand ed., 1911), *quoted in* Holland, *Purpose & Function*, *supra*, at 12 n.58. Further evidencing the importance of the state declarations of rights before the adoption of the Fourteenth Amendment, the United States Supreme Court held unanimously in a decision authored by Chief Justice John Marshall that the federal bill of rights afforded no protection against action by state governments, nor was federal protection needed:

> Each State established a constitution for itself, and in that constitution, provided such limitations and restrictions on the powers of its particular government as its judgment dictated . . . .
>
> In their several constitutions [the states] have imposed such restrictions on their respective governments, as their own wisdom suggested; such as they deemed most proper for themselves. It is a subject on which they judge exclusively. . . .

*Barron v. Baltimore*, 32 U.S. (7 Pet.) 243, 247-48 (1833). "[F]rom the Declaration of Independence until the Civil War, state declarations of rights were the primary guarantors of individual rights and civil liberties against infringement by the state government." Holland, *Purpose & Function*, *supra*, at 13.

67

The crucible of the Civil War and the post-war adoption of the Fourteenth Amendment would, of course, "fundamentally alter[] the original balance of power in the United States constitution by expanding federal power at the expense of state autonomy." *Id.* at 16. But in 1897, when Delaware adopted its current constitution, "the federal Bill of Rights was relatively unimportant compared to the bills of rights of the individual states." Ward & Lockwood, *Bill of Rights*, *supra*, at 82. "[T]he understanding of the Fourteenth Amendment in 1897 was that it did not apply individual federal rights against state governments. The first case in which the Due Process Clause of the Fourteenth Amendment was held to apply to state action was decided that very year—1897." *Id.* at 82-83 (citing *Chi. B. & Q. Railroad Co. v. Chicago*, 166 U.S. 226 (1897)). When delegates during the Convention of 1896-97 decided to maintain the Declaration of Rights without change and add provisions elsewhere to the Delaware Constitution, they understood themselves to be affecting in the most direct way possible the rights they would possess vis-à-vis their state government.

Today the United States Supreme Court has made most, but not all, of the protections in the federal Bill of Rights applicable to the states through the Due Process Clause of the Fourteenth Amendment. Despite their increased importance, federal constitutional standards continue "set only a minimum level of protection." Holland, *Purpose & Function*, *supra*, at 17.

> The declaration of rights or substantive provisions in a state's constitution may, and often do, provide for broader or additional rights. The expansion beyond federally guaranteed individual liberties by a state constitution is attributable to a variety of reasons: differences in textual language,

> legislative history, pre-existing state law, structural differences, matters of particular concern, and state traditions.

*Id.* (footnotes omitted). Although state law must comport with federal liberties, "state constitutions often can provide an independent and adequate basis for the adjudication of certain claims." *Id.*

Delaware's Declaration of Rights remains an "organic body of law." *Sanders v. State*, 585 A.2d 117, 146 n.25 (Del. 1990). In my view, the "[d]ifferences in structure between the federal and state constitutions" provides another strong reason to give independent meaning to the Elections Clause.

### 5.    Other *Jones* Factors

The final three *Jones* factors do not necessarily point in favor of a distinct and separate Delaware approach to voting rights and elections. The fifth *Jones* factor noted that a state constitution may "address matters of peculiar state interest or local concern." 745 A.2d at 865. Although elections and voting certainly are matters of paramount interest and concern in Delaware, they are not peculiarly or uniquely so. "When Americans are surveyed about what rights are most valued under their Constitution, the responses inevitably include the right to vote. . . . In short, the right to vote is part of our ethos for what it means to be an American."[46] This factor, therefore, does not weigh in favor of a special Delaware-based regime.

---

[46] Joshua A. Douglas, *Is the Right to Vote Really Fundamental?*, 18 Cornell J.L. & Pub. Pol'y 143, 144-45 (2008). As support Douglas cites work "showing that 93.2% of survey respondents believed that the right to vote is either the most important or one of the most important rights in a democracy." *Id.* at 144 n.1 (citing Brian Pinaire et al.,

The same is true with the sixth *Jones* factor, which notes that "[a] state's history and traditions may also provide a basis for the independent application of its constitution." 745 A.2d at 865. The historical discussion of Delaware's Constitution illustrates Delaware's consistent concern for elections, but that tradition is not unique or specific to Delaware. It is an American tradition.

Likewise, the seventh *Jones* factor observes that "[d]istinctive attitudes of a state's citizenry may . . . furnish grounds to expand constitutional rights" under a state charter. *Id*. I do not believe that Delaware's citizenry has a distinctive attitude towards voting and elections that differs materially from the attitudes of other Americans. I rather believe that we as Americans care deeply about elections and voting.

### 6. Summing Up

Based on the factors identified in *Jones*, I do not believe that the Elections Clause should be interpreted in lockstep with case law addressing the implied constitutional protection for voting rights under federal law that has been developed under the Fourteenth Amendment. I rather believe that the Elections Clause has independent content which the plaintiffs can enforce. Red Clay's argument that the state law claim should be dismissed on the basis of constitutional equivalency is rejected.

### D. The Effect Of Red Clay's Efforts On The Vote

---

*Barred from the Vote: Public Attitudes Toward the Disenfranchisement of Felons*, 30 Fordham Urb. L.J. 1519, 1533-34 (2003))

As its third argument in favor of dismissal, Red Clay asserts that a Delaware court only should consider voiding an election if it appears that the electoral misconduct affected the result. For purposes of the federal claim, Red Clay relies on the following standard from an unreported decision issued by the United States District Court for the U.S. Virgin Islands:

> No Court should invalidate an election and order a new one unless where there is a finding of fraud or deprivation of rights which would implicate the Constitution of the United States, unless there is a clear statutory provision requiring it[,] or unless violations of the statutory scheme were pervasive enough to affect or change the result of the election[.] Where irregularities are alleged, the burden of proof is on the plaintiff to show that the irregularities affect or change the result of the election by the questioned votes.

*Samuel v. V.I. Joint Bd. of Elections*, 2013 WL 106686, at *3 (D.V.I. Jan. 6, 2013) (quoting *Bryan v. Todman*, 1992 WL 12729455, at *1 (Terr. V.I. Dec. 17, 1992), *aff'd*, 1993 WL 13141075 (D.V.I. Oct. 29, 1993)). The *Samuel* opinion describes this passage as "[t]he standard for decertifying, or invalidating, an election in the Virgin Islands." *Id.* Solely to analyze Red Clay's motion to dismiss, this decision uses the Virgin Islands standard to test the sufficiency of the federal claim.

For purposes of the state claim, Red Clay relies on authority from closer to home. In *Brennan v. Black*, the Delaware Supreme Court stated that "minor irregularities in the conduct of an election unaccompanied by fraud or unfair dealing, and not affecting the result, will not void an election otherwise valid." 104 A.2d 777, 789 (Del. 1954).

In this case, the Complaint sufficiently pleads that Red Clay's interventions affected the result. The tax increase passed by a vote of 6,395 to 5,515. The winning

margin of 880 votes represented 7% of the residents who voted. Red Clay has approximately 165,000 residents who were eligible to vote in the Special Election.[47] Approximately 7% of the total residents voted, and the winning margin was 7% of that 7%, or less than 0.5% of the total voting population.

The outcome of the Special Election in Red Clay contrasted with the results of a special election conducted on the same day in the Christina school district, which is adjacent to Red Clay. The Christina school board did not engage in get-out-the-vote efforts. Although the Christina school district has slightly *more* eligible voters, it had two-thirds of the turnout: approximately 8,000 voters in Christina compared to approximately 12,000 in Red Clay.

Christina asked voters to approve two tax increases. Both failed. On the first, 6,076 voters opposed it, and 2,119 voters favored it. On the second, 6,348 voters opposed it, and 1,826 voters favored it. Notably, approximately 6,000 voters opposed the tax increase in both districts. But in Red Clay, there were many more residents who got out to vote in favor of the tax increase.

According to the Complaint, Red Clay affected the outcome of the Special Election by systematically encouraging and facilitating voting by residents with school-aged or pre-school-aged children who were more likely to vote in favor of the tax increase. Red Clay did not reach out to the same degree to all voters. Moreover, the

---

[47] By law, "[e]very citizen 18 years of age or over and a resident of" Red Clay was eligible to vote in the Special Election, "whether or not that citizen [was] at the time a registered voter for purposes of a general election." 14 *Del. C.* § 1077.

Family-Focused Events reduced turnout by elderly and disabled voters by interfering with their ability to access the polls.

At this stage of the proceeding, it is reasonable to infer that Red Clay's activities had the desired effect. Indeed, the contemporaneous failure of two tax referenda in Christiana offers the evidentiary equivalent of a control group. The outcomes of those votes support an inference that the Red Clay tax increase would have failed if Red Clay had not intervened.

At a later stage of the proceeding, the evidence may establish that this pleading-stage inference is incorrect. It may turn out that there are material distinctions between the voting populations in Red Clay and Christiana such that the results in the latter say nothing about the former. Or the evidence may be insufficient to show that Red Clay's interventions had an outcome-determinative effect. It also may be possible at a later stage to distinguish among particular instances or categories of conduct and particular school locations. It then might be possible to exclude from the voting results only the returns from polling places where the most problematic conduct occurred (such as the pizza-for-votes at Baltz or the free dinner at Heritage). At that point, it might be possible to determine that Red Clay's other interventions did not affect the outcome.

At this stage of the case, however, it is reasonable to infer that Red Clay's targeted efforts changed the result of the Special Election. Red Clay's third argument for dismissal fails to carry the day.

### E. Alternative Remedies: The Department Of Elections and the Attorney General

As its fourth argument for dismissal, Red Clay asserts that the Complaint should be dismissed because Delaware provides alternative remedies for electoral misconduct. Red Clay contends that the plaintiffs' proper remedy for any electoral violations was to contact the Department of Elections on the day the Special Election took place, not to sue to invalidate the election after the fact. They also contend that the Attorney General's decision not to bring criminal charges against any individuals involved in the Special Election should dispose of the civil claims.

Failing to contact the Department of Elections on the day of the Special Election does not preclude the plaintiffs from bringing a subsequent civil suit. To suggest otherwise would mean plaintiffs could never pursue a post-election day remedy. The General Assembly has rejected that notion, as evidenced by statutory provisions that create post-election day private rights of action. One set of statutory provisions, discussed in greater detail below, creates a procedure for post-election day challenges to candidate elections. *See infra* Part II.G.2.a. Another statute permits twenty-five or more persons who voted in the election to petition the Department of Elections for a recompilation of the results. 14 *Del. C.* § 1083(e). Still another statute gives a plaintiff a private cause of action against "any person or corporation . . . [that] hinders, controls, coerces or intimidates . . . any qualified elector of this State from or in the exercise of the elector's right to vote." 15 *Del. C.* § 5162. A person who suffers intimidation on the day of an election can report it to the Department of Elections, but the victim is not foreclosed from a post-election day remedy if no report is made, just as a victim of fraud or violence who

74

chooses not to contact the police on the day of the harm is not prevented from bringing a subsequent civil suit.

Red Clay fares no better with its contention that the Attorney General's decision not to bring criminal charges should dispose of the plaintiffs' civil claim. When deciding whether to bring criminal charges, the Attorney General makes a discretionary judgment. *Albury v. State*, 551 A.2d 53, 61 (Del. 1988). Assuming the Attorney General concludes that there is insufficient evidence to prove guilt beyond a reasonable doubt as to criminal conduct by particular individuals, that assessment does not mean that the evidence could not establish widespread electoral misconduct under the preponderance-of-the-evidence standard for purposes of a civil claim. *See Shahan v. Landing*, 643 A.2d 1357, 1359 (Del. 1994) (holding that because of different levels of proof in criminal and civil proceedings, an acquittal on the merits of a criminal charge is not *res judicata* as to a later conducted civil action). Moreover, as the Attorney General noted when considering similar election law issues in a different context, the Attorney General "has no jurisdiction to enforce" civil election violations. Del. Op. Att'y Gen. 06-IB04, 2006 WL 1242015, at *2 (Mar. 23, 2006). Unlike the existence of a criminal conviction, which can have *res judicata* effect in a civil proceeding, the absence of a criminal proceeding says nothing about the potential for a civil suit.[48]

---

[48] *Higgins v. Walls*, 901 A.2d 122, 137-38 (Del. Super. 2005) ("[U]nder modern law the decision of whether a criminal conviction can be conclusive as to a question of fact in a civil case rests in the sound discretion of the court." quoting *Cunningham v. Outten*, 2001 WL 428687, at *1 (Del. Super. Mar. 26, 2001)); *see also* 47 Am. Jur. 2d *Judgments* § 651 ("A judgment of conviction precludes the defendant from denying the

75

## F.    The Federal Claim

Red Clay premised its motion to dismiss on the four arguments that this decision has addressed. Having disposed of them, the central question posed by a Rule 12(b)(6) motion remains: Has the Complaint stated a claim on which relief can be granted? As noted, the plaintiffs contend that Red Clay deprived them of their right to vote without due process of law. They also contend that Red Clay violated their right to equal protection under the law. Both injuries occurred because Red Clay took steps to encourage and facilitate voting by electors with children (a group that Red Clay believed would favor of the tax increase) while raising obstacles to voting by the elderly and disabled (a group that Red Clay believed would oppose the tax increase). The plaintiffs have brought their federal claim as a Section 1983 action. Red Clay does not dispute that it is a "person" within the meaning of Section 1983 who can be sued under that statute, nor does Red Clay dispute that its electoral interventions constituted state action for purposes of the Fourteenth Amendment.

"[B]ecause the right to vote constitutes a liberty or property interest, government decisions that deprive an individual of that right . . . implicate the Due Process Clause." Pamela S. Karlan, *Framing the Voting Rights Claims of Cognitively Impaired Individuals*, 38 McGeorge L. Rev. 917, 919-20 (2007). "At least one federal court has held that infringements on the right to vote may violate the due process principles of

---

allegations in a subsequent civil complaint as to issues that were actually litigated and adjudicated in the prior criminal proceeding.").

'fundamental fairness.'" Michele J. Feinstein & David K. Webber, *Voting Under Guardianship: Individual Rights Require Individual Review*, 10 NAELA J. 125, 130 (2014) (citing *Doe v. Rowe*, 156 F. Supp. 2d 35, 47 (D. Me. 2001)). Most United States Supreme Court rulings concerning the right to vote, however, frame the issue in terms of the Equal Protection Clause. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance & Procedure* § 18.31(a) (2012 & Supp. 2015).

Due process analysis is employed if "a law burdens all persons equally when they exercise a specific right." *Id.* at § 14.7. Equal protection, on the other hand, is applied when a "law distinguishes between who may and who may not exercise a right." *Id.* Applying the Equal Protection Clause makes more sense in this case. Although the plaintiffs can claim to have been denied the right to vote, the real problem was that Red Clay treated identifiable groups of voters differently by favoring families with children and disfavoring the elderly and disabled. That is a complaint about unequal treatment best addressed under the Equal Protection Clause.

When evaluating a claim under the Equal Protection Clause, the first step is "to determine the appropriate level of scrutiny." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 643 (3d Cir. 2003). For purposes of this step, the distinction between a due process claim and an equal protection claim does not matter much, because "[r]egardless of whether a court is employing substantive due process or equal protection analysis, it should use the same

standards of review."[49] "If a statute invades a 'fundamental' right or discriminates against a 'suspect' class, it is subject to strict scrutiny."[50] Under strict scrutiny, the state has the burden demonstrate that its action or regulation serves a compelling government interest and was narrowly tailored to serve that interest. *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995).

Although the federal constitution does not guarantee the right to vote, the United States Supreme Court has held that voting is a fundamental right. [51]

---

[49] Rotunda & Nowak, *supra*, § 15.4(a); *accord Plante v. Gonzalez*, 575 F.2d 1119, 1128 n.15 (5th Cir. 1978) (noting that "due process and equal protection arguments often [are] transformed into each other, and although the standard of review may be the same under either characterization, there is value in maintaining the conceptual distinction"); Miranda Perry, *Kids and Condoms: Parental Involvement in School Condom-Distribution Programs*, 63 U. Chi. L. Rev. 727, 760 (1996) ("Both equal protection and due process analysis employ the strict scrutiny standard of review when regulations or classifications affect the exercise of fundamental rights.").

[50] *Mass. Bd. of Ret. v. Murcia*, 427 U.S. 307, 319 (1976); *accord Regents of Univ. of Cal. v. Bake*, 438 U.S. 265, 357 (1978) (Brennan, J., concurring in the judgment and dissenting in part) ("[A] government practice or statute which restricts 'fundamental rights' or which contains 'suspect classifications' is to be subjected to 'strict scrutiny'"); Cain Norris & Whitney Turk, *Equal Protection*, 14 Geo. J. Gender & L. 397, 402 (2013) ("A state action that impinges on a fundamental right is subject to strict scrutiny even if a group affected is not a suspect or quasi-suspect class."). *But see* Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment. 227, 239 (2006) (arguing that "the old adage about laws infringing fundamental rights being subject to strict scrutiny remains a favorite of scholars, judges, and law students" but "is flatly wrong").

[51] *See, e.g., Bartlett v. Strickland*, 556 U.S. 1, 10 (2009) (describing the right to vote as "one of the most fundamental rights of our citizens"); *Romer v. Evans*, 517 U.S. 620, 650 n.3 (1996) ("[W]e have declared the right to vote to be a fundamental political right") (internal quotations marks omitted); *Burdick v. Takushi,* 504 U.S. 428, 433 (1992) ("It is beyond cavil that 'voting is of the most fundamental significance under our

> [T]he right to vote is accorded extraordinary treatment because it is, in equal protection terms, an extraordinary right: a citizen cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process. Those denied the vote are relegated, by state fiat, in a most basic way to second-class status.

*Plyler v. Doe*, 457 U.S. 202, 233 (1982).

Although the application of strict scrutiny to state action involving the right to vote was once clear cut,[52] the United States Supreme Court has since developed a more flexible standard of review that is more deferential to government actors. The more lenient standard recognizes that

> [e]lection laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently."

*Burdick,* 504 U.S. at 433 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

---

constitutional structure'") (quoting *Ill. Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979)).

[52] *See Plyler*, 457 U.S. at 233 (Blackmun, J., concurring) (noting that "the Court's decisions long have accorded strict scrutiny to classifications bearing on the right to vote in state elections"); *accord* Kelly T. Brewer, *Disenfranchise This: State Voter Id Laws and Their Discontents, A Blueprint for Bringing Successful Equal Protection and Poll Tax Claims,* 42 Val. U. L. Rev. 191, 195-96 (2007) ("Courts considering [Fourteenth Amendment disenfranchisement] challenges have traditionally applied the strict scrutiny analysis, requiring that the regulation employ narrowly tailored means to accomplish a compelling regulatory interest.").

To evaluate state action under what is now commonly called the *Burdick* test, a court weighs the degree to which the state's intervention has affected the right to vote against the regulatory interests that the state sought to protect. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring). "The first step is to decide whether a challenged law severely burdens the right to vote." *Id.* at 205. "Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe. Burdens are severe if they go beyond the merely inconvenient." *Id.* (citations omitted).

Next, the court "must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Anderson,* 460 U.S. at 789. Having done so, the court must "must weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789). If the burden imposed on the right to vote is "severe," then strict scrutiny applies, and the state's intervention must be narrowly tailored to "advance a state interest of compelling importance." *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). If the burden imposed is not severe, then the state's intervention need only have served a "legitimate interest" and represent a "reasonable way of accomplishing this goal." *See id.* at 440. When the state has imposed "reasonable, nondiscriminatory restrictions" on voting rights,

then "important regulatory interests are generally sufficient to justify" the intervention. *Id.* at 434 (quoting *Anderson*, 460 U.S. at 788).

State interventions in elections thus confront "a sliding scale of scrutiny." Joel A. Heller, *Fearing Fear Itself: Photo Identification Laws, Fear of Fraud, and the Fundamental Right to Vote*, 62 Vand. L. Rev. 1871, 1876 (2009). Not surprisingly, if the burden from the state's intervention is deemed not to be severe, then the challenge is likely to be rejected and the state's action upheld, but if the burden of the state's intervention is deemed severe, then the state's justifications are less likely to carry the day. Nevertheless, no matter how slight the burden on voting may be, "it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89).

For pleading purposes, under *Burdick*, the plaintiffs have stated a claim against Red Clay based on the district's electoral interventions as a whole. For analytical clarity, this decision examines Red Clay's electoral interventions using the three broad categories presented in the public policy discussion: government campaign speech, selective rewards for voting, and selective get-out-the-vote efforts. Although this decision takes the view that certain activities by Red Clay, standing alone, would not support a claim for a violation of the Fourteenth Amendment, the Complaint does not challenge isolated, severable instances of conduct. It challenges Red Clay's interventions in the aggregate.

1. **Government Campaign Speech Under The Fourteenth Amendment**

The first way that Red Clay intervened in the Special Election was through government campaign speech. Put simply, Red Clay advocated for the tax increase and sought to convince voters to vote in favor of it. To re-iterate, the plaintiffs have *not* challenged Red Clay's campaign advocacy as a violation of the Free Speech Clause. They contend that Red Clay violated the Fourteenth Amendment. The proper test for analyzing this claim is *Burdick* balancing.

The Complaint alleges that Red Clay engaged in the following examples of broadly directed campaign speech:

- Mailings of the Red Clay Record and postings on the district website.

- Public meetings and workshops.

- Statements to the media.

- Signs in and around the schools, such as the sign at Baltz Elementary that stated, "Support the Baltz Bear by voting yes."

- Parents stationed at schools on the day of the Special Election to encourage voters to support the tax increase, such as the parents at A.I. DuPont Middle School who sat at desks by the entrance and told prospective voters that if they did not vote in favor, students would not have after-school activities.

As I see it, if these had been the only types of conduct in which Red Clay engaged, the Complaint would not state a claim under the Fourteenth Amendment.

The first step under *Burdick* is to decide whether the state's activities severely burdened the right to vote. In my view, Red Clay's campaign speech did not *severely* burden the right to vote. As the cases applying state law restrictions on government campaign speech have noted, *see infra* Part II.G.3.b, at some level government campaign speech in favor of one side in an election contest aids that side and burdens the opposing

side. Perhaps there could be a case where the government speech in favor of one side could be sufficiently extensive and overbearing to constitute a severe burden on the opponents. The allegations of the Complaint do not support a reasonable inference that Red Clay's government campaign speech reached that level.

The next step in *Burdick* is to identify and evaluate the precise interest relied on by the government to justify its electoral intervention. The interest here is one that the United States Supreme Court has recognized: "There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in [an] election." *Anderson*, 460 U.S. at 796.

Based on the allegations of the Complaint, Red Clay's interest in fostering an informed electorate was sufficient to justify engaging in government campaign speech. If Red Clay only had engaged in these activities, then the Complaint would not state a claim under the Fourteenth Amendment. This observation does *not* mean that Red Clay's campaign speech necessarily will survive any legal challenge. It still may violate other sources of federal or state law—in this case, the Elections Clause. *See infra* Part II.G.

### 2. Selective Rewards For Voting Under Federal Law

At the other end of the spectrum is Red Clay's decision to intervene in the election by providing rewards for voting designed to appeal to families with school-aged and pre-school-aged children—a particular demographic group that Red Clay believed was likely to support the tax increase. Interventions falling under this heading included the paper chits at Baltz Elementary School that holders could turn in for pizza after they voted, the free dinner held for parents and students at Heritage Middle School, and the other

Family-Focused Events that Red Clay held at its schools on the day of the Special Election. Although the rewards nominally were open to everyone, the Complaint's allegations support an inference that Red Clay understood and intended for the Family-Focused Events to appeal to a subset of the electorate that was likely to favor the tax increase, thereby rewarding that demographic group. Framed provocatively, the Family-Focused Events functioned as the opposite of a poll tax. Rather than imposing a tax on voting that was nominally neutral but actually discriminatory, Red Clay offered a reward for voting that was nominally neutral but actually discriminatory.[53]

The United States Supreme Court has been skeptical of state interventions that operate differently on different subsets of the electorate. *See generally* Christopher L.

---

[53] Using the poll tax analogy is provocative because the United States Supreme Court has invalidated poll taxes and other voting-related fees that discriminate on the basis of wealth. *See*, *e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666 (1966).

> We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax. Our cases demonstrate that the Equal Protection Clause of the Fourteenth Amendment restrains the States from fixing voter qualifications which invidiously discriminate. Thus without questioning the power of a State to impose reasonable residence restrictions on the availability of the ballot, we held . . . that a State may not deny the opportunity to vote to a bona fide resident merely because he is a member of the armed services. . . . Previously we had said that neither homesite nor occupation affords a permissible basis for distinguishing between qualified voters within the State. We think the same must be true of requirements of wealth or affluence or payment of a fee.

*Id.* at 666-67 (footnote, citations, and internal quotation marks omitted).

Elmendorf, *Structuring Judicial Review of Electoral Mechanics: Explanations and Opportunities*, 156 U. Penn. L. Rev. 313, 365-76 (2007). In *Anderson*, the United States Supreme Court stated that "[i]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." 460 U.S. at 793. The *Anderson* decision cited as an example *Bullock v. Carter*, 405 U.S. 134, 143 (1972), in which the United States Supreme Court held that high filing fees for candidates imposed by Texas law were unconstitutional because of the "obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required by the Texas system." 405 U.S. at 144. In *Anderson*, the United States Supreme Court invalidated Ohio's filing deadline for third party candidates, finding that it "place[d] a particular burden on an identifiable segment of Ohio's independent-minded voters," *id.* at 792, and "discriminate[d] against those candidates and—of particular importance—against those voters whose political preferences like outside the existing political parties." *Id.* at 794. The *Anderson* decision rejected as inadequate the state's efforts to justify the early filing deadline based on the state's interests in (i) the electorate having time to become informed about candidates, (ii) the administrative benefits of treating all candidates identically, and (iii) the goal of avoiding intraparty feuding by eliminating the opportunity for a candidate to lose in the party primary and then run as an independent candidate. *Id.* at 798, 801, 806.

As in *Anderson,* the "identifiable political group" need not be a suspect class. "'Fencing out' from the franchise a sector of the population because of the way they may

85

vote is constitutionally impermissible."[54] Nevertheless, there must be an "independently identifiable group or category" that is affected by the state's action. *Gordon v. Lance*, 403 U.S. 1, 5 (1971) (rejecting challenge that failed to identify such a group).

As part of its sensitivity to incursions that operate differently on different subsets of the electorate, the United States Supreme Court appears to take into account whether the government acted with discriminatory intent. Justice O'Connor explained the relevance of motive in *Clingman v. Beaver*, 544 U.S. 581 (2005).

> Where the State imposes only reasonable and genuinely neutral restrictions . . ., there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing cause for concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.

*Id.* at 603 (O'Connor, J., concurring). Where the facts suggest discriminatory intent, the state's intervention is more likely to be viewed as imposing a significant burden.

---

[54] *Carrington v. Rash*, 380 U.S. 89, 94 (1965) (invalidating Texas law that excluded members of the Armed Forces who moved their residency to Texas from voting in Texas elections as long as they remained in the Armed Forces); *accord Patriot Party of Allegheny Cty. v. Allegheny Cty. Dep't of Elections*, 95 F.3d 253, 262, 264, 269 (3d Cir. 1996) (invalidating Pennsylvania law that prevented cross-nomination and fusion only for minor political parties because it severely burdened two identifiable groups—the minority party and those who wished to vote for its candidates—and "constitute[d] the type of invidious discrimination prohibited by the Fourteenth Amendment"); *Stoddard v. Quinn*, 593 F. Supp. 300, 305 (D. Me. 1984) (invalidating statutory filing deadline under the *Anderson* balancing approach because it placed a burden on an "identifiable segment of Maine voters—those who may be dissatisfied with the major parties' choices").

Once again, the first step under *Burdick* is to decide whether the state's activities burdened the right to vote. In my view, by providing rewards designed to appeal to a particular segment of the electorate, Red Clay engaged in discriminatory conduct that severely burden the right to vote. Red Clay did the opposite of what the United States Supreme Court criticized in *Anderson*. Rather than restricting political participation by one identifiable political group, it took steps to enhance political participation by another identifiable political group. As in *Bullock*, there was an "obvious likelihood" that this intervention would fall more heavily on other political groups for whom the rewards were less attractive—in this case the elderly and the disabled. The fact that the rewards were nominally available to everyone does not insulate them from scrutiny. "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jennies v. Fortson*, 403 U.S. 431, 442 (1971).

Equally important, the Complaint alleges that Red Clay's selective rewards did more than just benefit the favored group. They also (allegedly) had the purpose and effect of discouraging voting by the elderly and disabled, an identifiable group that Red Clay believed would oppose the tax increase. The Family-Focused Events thus had the type of negative effect identified as problematic in *Anderson*.

To date, the only interest that Red Clay has advanced for its electoral interventions is its desire to provide information to the electorate about an issue within the scope of its government functions. That interest sufficiently justifies government campaign speech for Fourteenth Amendment purposes, but it does not justify selective and discriminatory interventions. Perhaps at a later stage of the case Red Clay will advance interests

sufficient to justify providing rewards for voting tailored for an identifiable political group. For present purposes, the Complaint states a claim under Section 1983 and the Fourteenth Amendment based on the selective rewards for voting.

### 3. Selective Get-Out-The-Vote Efforts Under The Fourteenth Amendment

Red Clay also intervened in the Special Election through selective get-out-the-vote efforts. This category of conduct falls into a zone between government campaign speech and selective rewards for voting. The efforts in this category include the school administrators who called older students out of class to vote, and the use of district resources like the automated phone systems and Red Clay's school messenger system to remind parents of enrolled students to vote. Red Clay's targeted campaign speech also falls within this category. The example of targeted campaign speech cited in the Complaint was Superintendent Daugherty's letter to families in the district with school-aged and pre-school-aged children.

Whether Red Clay's selective get-out-the-vote efforts severely burdened the right to vote is a close call. Like the rewards for voting, the selective get-out-the-vote efforts discriminated among identifiable political groups, but the effects seem less substantial.

Regardless of whether or not the burden was severe, the only interest that Red Clay has advanced remains its desire to educate the electorate. To my mind, that interest does not justify taking students out of class to vote. Getting voters who were likely to favor the tax increase to the polls did not provide the electorate with information. It helped Red Clay get the result it wanted. For pleading-stage purposes, Red Clay has not

88

justified that measure. Red Clay's targeted communications at least provided information to part of the electorate, but the fact that Red Clay sent its communications to only a subset of the voter base undercuts its avowed interest in educating the electorate.

For purposes of the motion to dismiss, it does not seem possible to distinguish Red Clay's selective efforts to get out the vote from Red Clay's conduct as a whole, which included the Family-Focused Events and the instances of food-for-voting at Baltz Elementary School and Heritage Middle School. The Complaint states a claim under Section 1983 based on Red Clay's conduct as a whole.

## G. The State Law Claim

As with the federal claim, the central question posed by the Rule 12(b)(6) motion is whether the Complaint has stated a claim for violations of the Elections Clause. It does.

Analyzing the Elections Clause claim is difficult, because it remains true that there is a "dearth of case law" addressing the clause. *Abbott v. Gordon,* 2008 WL 821522, at *19 (Del. Super. Mar. 27, 2008). The most obvious sources of authority for applying the Elections Clause are the language of the clause itself, the *Abbott* decision, and decisions from other states interpreting their analogous constitutional provisions. As further sources of authority, this opinion looks to (i) the statutory framework in Title 15 that identifies bases for challenging elections involving candidates, (ii) criminal statutes that proscribe certain electoral misconduct, (iii) the Anti-Bribery Clause of the Delaware Constitution, and (iv) the Delaware Equal Accommodation Act. After discussing these sources of authority, this decision examines Red Clay's specific electoral interventions.

### 1. The Text Of The Elections Clause

Any effort to apply the Elections Clause must begin with its text. The language is simple, straightforward, and mandatory: "All elections shall be free and equal." Del. Const. art. I, § 3.

The only Delaware case to touch meaningfully on the Elections Clause is *Abbott*. There, an unsuccessful candidate for New Castle County Council claimed that county officials had engaged in a civil conspiracy to violate the Elections Clause by attacking him and engineering his defeat in the Republican primary. The court observed that the purpose of the Elections Clause "is to ensure that the right of citizens to vote in an election is unfettered." *Abbott*, 2008 WL 821522, at *19 (citing *State ex rel. James v. Battersby*, 56 A.2d 527, 532 (Del. Super. Ct. 1947). The court dismissed the claim because the candidate had not alleged that "Delaware citizens were disenfranchised[,] . . . that their access to the polls was disturbed, that the process by which ballots were accepted and counted was flawed, or that Defendants somehow tainted the election results." *Id.* at *20. The court observed that the election law violations in which the defendants allegedly engaged might have affected the voters' decisions, but not the outcome. On the facts alleged, the court concluded that the voters had a free and equal opportunity to decide the outcome of the primary for themselves.

State courts in other jurisdictions have given more frequent consideration to their versions of the Elections Clause. *See supra* Part II.C.1 (collecting cases). Many of the cases from other jurisdictions deal with conduct by private actors. Comparably few deal with government interventions in the electoral process.

The State of Kentucky is an example of a jurisdiction with a developed Elections Clause jurisprudence. One court has described Kentucky as having "the most developed jurisprudence of any state on what [the free and equal election] clause means in relation to ballot problems." *Gunaji v. Macias*, 31 P.3d 1008, 1016 (N.M. 2001).

In one of the earliest decisions interpreting Kentucky's Elections Clause, the Kentucky Supreme Court considered a challenge to a referendum where the clerk administering the vote had not printed enough ballots, leaving 448 voters unable to vote. The referendum passed by 558 votes. Interpreting the constitutional provision, the Kentucky Supreme Court stated:

> Strictly speaking, a free and equal election is an election at which every person entitled to vote may do so if he desires, although in dealing with the practical aspect of elections, it could hardly be said that, if only a few were prevented from voting, the election would not be free and equal, in the constitutional sense. The very purpose of elections is to obtain a full, fair, and free expression of the popular will upon the matter, whatever it may be, submitted to the people for their approval or rejection; and when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal, in the meaning of the [Kentucky] Constitution.

*Wallbrecht v. Ingram*, 175 S.W. 1022, 1026 (Ky. 1915). Continuing, the Kentucky Supreme Court explained the breadth of the protection provided by the clause:

> Nor do we think it material whether the cause that prevented persons legally entitled to vote from exercising the right of suffrage was due to some imperfection or insufficiency in the statute regulating the conduct of elections or to fraud, intimidation, violence, bribery, or other wrongdoing that prevented a full and free expression of the will of the people. The constitutional provision is mandatory. It applies to all elections, and no election can be free and equal, within its meaning, if any substantial number of persons entitled to vote are denied the right to do so. . . . In short, this constitutional provision admits of no evasions or exceptions. No amount of good intention or good faith can be allowed to defeat its purpose

91

> or meaning. When the question of elections arises, the single inquiry will be: Was the election free and equal, in the sense that no substantial number of persons entitled to vote and who offered to vote were denied the privilege?

*Id.* at 1026-27.

Since *Wallbrecht*, Kentucky decisions have applied the Kentucky Elections Clause to a wide range of situations, including (i) elections tainted of fraud, violence, and intimidation,[55] (ii) challenges to state election laws and voting procedures,[56] and (iii) attempts to influence voters by providing bribes or other rewards for voting.[57]

---

[55] *Hodges v. Hodges*, 314 S.W.2d 208, 212 (Ky. 1958) (intimidation); *Taylor v. Neutzel*, 295 S.W. 873, 875 (Ky. 1927) (fraud, intimidation, violence, ballot stuffing, and use of "imposters" to vote); *Burns v. Lackey*, 186 S.W. 909, 912-13 (Ky. 1916) (intimidation and violence); *Stewart v. Wurts*, 135 S.W. 434, 438 (Ky. 1911) (fraud and illegal voting); *Skain v. Milward*, 127 S.W. 773, 775 (Ky. 1910) (fraud, intimidation, and violence); *Scholl v. Bell*, 102 S.W. 248, 250, 255 (Ky. 1907) (fraud, intimidation, violence); *Adair Cty. Bd. of Elections v. Arnold*, 2015 WL 5308132, at *11-12 (Ky. Ct. App., Sept. 11, 2015) (fraud and illegal voting).

[56] *McIntosh v. Helton*, 828 S.W.2d 364, 367 (Ky. 1992) (use of initials instead of full name for write-in candidate); *Upton v. Knuckles*, 470 S.W.2d 822, 826-27 (Ky. 1971) (incorrect voters' oath and excessive number of people at voting machines); *Ferguson v. Rohde*, 449 S.W.2d 758, 760 (Ky. 1970) (right of candidate to appear on ballot); *Arnett v. Hensley*, 425 S.W.2d 546, 548-59 (Ky. 1968) (use of absentee ballots); *Hodges*, 314 S.W.2d at 212 (failure to sign ballots and signature books and to take oaths and violations of voter qualification requirements); *Burchell v. Smith*, 262 S.W.2d 365, 367 (Ky. 1953) (improper ballots and no voting booths, blinds, or curtains); *Asher v Arnett*, 132 S.W.2d 772, 775-76 (Ky. 1939) (candidate's compliance with election procedures); *Skain*, 127 S.W. at 775 (district reapportionment); *Hocker v. Pendleton*, 39 S.W. 250, 250 (Ky. 1897) (insufficient ballots, booths, and stencils); *Commonwealth v. McClelland*, 83 Ky. 686, 691 (Ky. 1886) (voter qualifications); *Arnold*, 2015 WL 5308132, at *2-3 (clerk failing to properly follow district lines when registering voters).

[57] *Middleton v. Poer*, 121 S.W.2d 28, 30 (Ky. 1938) (affirming trial court's decision to vacate election because "money and whiskey were used to influence voters"); *Neutzel*, 295 S.W. at 883 (bribery); *Burns*, 186 S.W. at 912 (the use of "money, illegally,

Summarizing the operative principles, a later decision by the Kentucky Supreme Court stated:

> [A]n election is free and equal within the meaning of the [Kentucky] Constitution when it is public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter under the law has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him.

*Asher*, 132 S.W.2d at 776 (quoting 18 Am. Jur. *Elections* 184-85).

The State of Illinois also has a well-developed Elections Clause jurisprudence.[58] In an early decision, the Supreme Court of Illinois was asked to determine the constitutionality of a law addressing election administration which applied only to municipalities that opted into it.[59] The plaintiffs argued that because adoption of the law

---

wrongfully, and improperly to influence the voters"); *Skain*, 127 S.W. at 774 (bribery); *Scholl*, 102 S.W. at 250 (bribery).

[58] Despite extensive case law giving independent meaning to the Illinois Elections Clause, at least one Illinois opinion has described the provision as operating in lockstep with the implied federal regime crafted under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Fumarolo v. Chi. Bd. of Educ.*, 566 N.E.2d 1283, 1290 (Ill. 1990). Subsequent Illinois cases have given independent content to the clause. *See Stroger v. Reg'l Transp. Aut'y*, 778 N.E.2d 683, 689 (Ill. 2002); *Orr v. Edgar*, 670 N.E.2d 1243, 1252 (Ill. App. Ct. 1996) ("Our examination of the rights conferred by this constitutional provision is not, however, exclusively confined to a fourteenth amendment analysis."). The debate does not affect this decision's ability consider as a source of persuasive authority those cases that have given the Illinois Elections Clause independent meaning.

[59] *See People v. Hoffman*, 5 N.E. 596 (Ill. 1886). Although now appearing in Article 3, § 3 of the Illinois Constitution, when *Hoffman* was decided the clause was found in Article II, § 16.

would not be uniform, the resulting elections would not be "equal." In rejecting this

argument, the Illinois Supreme Court explained what a "free and equal" election meant:

> Elections are free when the voters are subjected to no intimidation or improper influence, and when every voter is allowed to cast his ballot as his own judgment and conscience dictate. Elections are equal when the vote of every elector is equal in its influence upon the result to the vote of every other elector; when each ballot is as effective as every other ballot. Where an election for or against the same candidates, or for or against the same measure, takes place on the same day, in two different cities of the state, the fact that in one city the election officers make their returns to the city clerk, while in the other the returns are made to the county clerk, cannot possibly make any difference in the freedom or equality of the election.

*Hoffman*, 5 N.E. at 599-60. The constitutional provision thus required a basic level of

fairness, but it did not require state-wide uniformity in every administrative detail.

As in Kentucky, Illinois decisions have applied these general principles to myriad

situations, including (i) the constitutionality of various legislative acts,[60] (ii) challenges to

---

[60] *Stroger*, 778 N.E.2d at 689 (statute providing procedure for appointing directors of state agency); *Bridgewater v. Hotz*, 281 N.E.2d 317, 323 (Ill. 1972) (statute regulating county elections); *Carstens v. Bd. of Educ. of E. Alton-Wood River Cmty. High Sch. Dist.*, 187 N.E.2d 682, 684-85 (Ill. 1963) (school code regulating ballots in special election); *People ex rel. Honefenger v. Burris*, 95 N.E.2d 882, 887-88 (Ill. 1950) (act authorizing incorporation of park district); *People v. Deatherage*, 81 N.E.2d 581, 588 (Ill. 1948) (act authorizing organization of school districts); *Moran v. Bowley*, 179 N.E. 526, 527 (Ill. 1932) (act reapportioning state congressional districts); *McAlpine v. Dimick*, 157 N.E. 235, 238 (Ill. 1927) (act regulating primaries); *People v. Fox*, 128 N.E. 505, 507 (Ill. 1920) (law permitting political party to divide county into districts for primary election without requiring uniformity as to number of voters); *Rouse v. Thompson*, 81 N.E. 1109, 1122-23 (Ill. 1907) (statute regulating nominating procedures); *see People ex rel. Royal v. Cain*, 101 N.E.2d 74, 78 (Ill. 1951) (act authorizing organization of hospital districts); *see also Hulme v. Madison Cty.*, 188 F. Supp. 2d 1041, 1054 (S.D. Ill. 2001) (redistricting plan); *Clark v. Ill. State Bd. of Elections*, 17 N.E.3d 771, 796-77 (Ill. App. Ct. 2014) (constitutionally provided ballot initiative procedure).

election procedures,[61] (iii) the framing and presentation of issues and candidates on the ballot,[62] and (iv) claims that elections were tainted by fraud or intimidation.[63] Summarizing the applicable standards, a later Illinois Supreme Court decision stated that

> [a]n election is free where the voters are exposed to no intimidation or improper influence and where each voter is allowed to cast his ballot as his own conscience dictates. Elections are equal where the vote of each voter is equal in its influence upon the result to the vote of every other elector— where each ballot is as effective as every other ballot.

---

[61] *Craig v. Peterson*, 233 N.E.2d 345, 347 (Ill. 1968) (validity of absentee ballots); *Thompson v. Conti*, 233 N.E.2d 351, 355 (Ill. 1968) (rules governing town meeting); *People ex rel. Daniels v. Carpentier*, 198 N.E.2d 514, 516 (Ill. 1964) (primary nomination procedures); *Larvenette v. Elliot*, 107 N.E.2d 743, 744 (Ill. 1952) (procedures regulating petitions for candidate elections); *People ex rel. Funk v. Hagist*, 82 N.E.2d 621, 622-23 (Ill. 1948) (school district election procedure); *People ex rel. Agnew v. Graham*, 108 N.E. 699, 705-06 (Ill. 1915) (time and place of elections); *People ex rel. Hoyne v. McCormick*, 103 N.E. 1053, 1057 (Ill. 1913) (limits on legislative power to regulate election procedure); *see also Bazydlo v. Volant*, 636 N.E.2d 1107, 1111 (Ill. App. Ct. 1994) (validity of un-initialed absentee ballots).

[62] *Vill. of Deerfield v. Rapka*, 296 N.E.2d 336, 340 (Ill. 1973) (holding that the free and equals elections clause prohibits combining separate and unrelated questions into a single proposition for submission to a vote); *Roll v. Carrollton Cmty. Unit Sch. Dist. No. 1*, 121 N.E.2d 1, 2 (Ill. 1954) (conducting single-proposition analysis); *People ex rel. Hall v. Bopp*, 71 N.E.2d 351, 352-53 (Ill. 1947) (same); *Routt v. Barrett*, 71 N.E.2d 660, 665-66 (Ill. 1947) (same); *Hagler v. Small*, 138 N.E. 849, 851 (Ill. 1923) (same); *People ex rel. Schnackenberg v. Czarnecki*, 100 N.E. 283, 286 (Ill. 1912) (candidates right to be on a ballot in municipal election); *Chi. Bar Ass'n v. White*, 898 N.E.2d 1101, 1106 (Ill. App. Ct. 2008) (vote at constitutional convention); *Richardson v. Leibovitz*, 637 N.E.2d 1217, 1220 (Ill. App. Ct. 1994); (conducting single-proposition analysis); *see Hester v. Kamykowski*, 150 N.E.2d 196, 200 (Ill. 1958) (quality of ballot paper in context of ballot secrecy).

[63] *Emery v. Hennessy*, 162 N.E. 835, 837 (Ill. 1928) (fraud); *People ex rel. Agnew v. Graham*, 108 N.E. 699, 705-06 (Ill. 1915) (fraud); *Ross v. Kozubowski*, 538 N.E.2d 623, 627 (Ill. App. Ct. 1989) (fraud); *Goree v. LaVelle*, 523 N.E.2d 1078, 1080 (Ill. App. Ct. 1988) (fraud); *People ex rel. Elder v. Quilici*, 33 N.E.2d 492, 495 (Ill. App. Ct. 1941) (intimidation); *see Craig*, 233 N.E.2d at 192 (fraud); *Hester*, 150 N.E.2d at 200 (fraud).

*Moran*, 179 N.E. at 531 (citations omitted).

## 2. Other Sources Of Content

As the preceding section demonstrates, the words "free" and "equal" are broad and expansive terms that can be applied to a variety of contexts. When imbuing terms like these with content, I believe a judge should strive to be guided by more than the judge's own subjective views about what they should mean. The judge instead should look to embodiments of those concepts that have been deeply and widely endorsed, such as indications from other provisions of the Delaware Constitution (including its overall structure), state statutes, and longstanding doctrines of common law. When construing other provisions the Declaration of Rights, the Delaware Supreme Court has looked to similar authorities.[64]

---

[64] *See, e.g., State v. Wright*, 67 A.3d 319, 322 (Del. 2013) (interpreting bail clause in light of criminal statutes); *Griffin v. State*, 47 A.3d 487, 490 (Del. 2012) (interpreting right to bear arms in light of other states' statutes and constitutions); *Dorsey v. State*, 761 A.2d 807, 819 (Del. 2000) (interpreting search-and-seizure clause in light of 150 years of precedent under related Delaware statute); *Claudio v. State*, 585 A.2d 1278, 1290-91, 1303-05 (Del. 1991) (interpreting right to jury trial based on common law precedent, jury instructions, criminal procedure rules, and criminal statutes); *Chesapeake Utils. Corp. v. Hopkins*, 340 A2d 154, 156-57 (Del. 1975) (construing corruption-of-blood clause in conjunction with Remedies Clause); *State v. Flowers*, 330 A.2d 146, 147-49 (Del. 1974) (interpreting right-to-bail clause by examining Delaware statutes and similar clauses in other states); *State v. Cannon*, 190 A.2d 514, 515-18 (Del. 1963) (interpreting prohibition on cruel and unusual punishments in light of common law, Delaware Supreme Court precedent, and historical and contemporary statutes); *Piekarski v. Smith*, 153 A.2d 587, 592 (Del. 1959) (relying on treatise to interpret right-to-petition clause); *see Mott v. State*, 9 A.3d 464, 465-66 (Del. 2010) (interpreting grand jury clause based on common law precedent); *E. Lake Methodist Episcopal Church, Inc. v. Trs. of Peninsula-Del. Annual Conference of the United Methodist Church, Inc.*, 731 A.2d 798, 808 (Del. 1999) (interpreting freedom-of-religion clause in light of precedent analyzing Delaware's Religious Societies Act of 1787); *Curran v. Woolley*, 104 A.2d 771, 772-74 (Del. 1954)

For present purposes, this decision looks to (i) the statutory framework for challenging the outcome of a candidate election, (ii) election-related criminal statutes, (iii) the Anti-Bribery Clause, and (iv) the Delaware Equal Accommodation Act. These sources are not exclusive. At later stages of the case, the parties may point to other informative authorities.[65]

### a. The Election Contest Statute

Delaware civil statutes addressing analogous situations provide a source of content for applying the Elections Clause. For elections involving candidates, Delaware law establishes a series of statutory methods for challenging the result.[66] For most elected offices, the statutory procedure is as follows:

> Any person claiming to be elected to an office to be exercised in and for any county, district or hundred may contest the right of any person declared to be duly elected to such office for any of the following causes:
>
> (1) For malconduct on the part of the election officers or clerks holding the election, or any one of them;
>
> (2) When the person whose right to the office is contested was not at the time of the election eligible to such office;

---

(examining parameters of habeas corpus using state and federal statutes and common law precedent).

[65] As just one example, several of the older cases interpreting the Elections Clauses of other states cite Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest Upon the Legislative Power of the States of the American Union* (8th ed. 1927). It seems likely that this treatise and others would shed additional light on the meaning of the Elections Clause.

[66] *See* 15 *Del. C.* § 5901 (challenge to election as member of General Assembly); *id.* at § 5921 (challenge to election of persons chosen as electors of the President or Vice President of the United States); *id.* at § 5941 (challenge to other offices).

(3) When the person whose right is contested has given to any elector or inspector, judge or clerk of election, any bribe or reward or shall have offered any bribe or reward for the purpose of procuring his or her election;

(4) On account of illegal votes.

*Id.* at § 5941 (the "Election Contest Statute").

The Election Contest Statute is part of Title 15, the purpose of which is "to assure the people's right to free and equal elections, as guaranteed by our state Constitution." *Id.* at § 101A. In light of this purpose, it seems reasonable that if conduct violates the provisions of Title 15, it is inconsistent with the "right to free and equal elections." By its terms, of course, the Election Contest Statute does not apply directly to a school referendum; it only applies to an election involving candidates. It nevertheless seems logical that if misconduct would support a challenge under the Election Contest Statute, it should support a cause of action under the Elections Clause. In the current case, the analogous type of conduct would be if persons involved in the school referendum gave "to any elector . . . any bribe or reward or shall have offered any bribe or reward" for the purpose of procuring the outcome favored by the persons offering the bribe or reward. *Id.* at § 5941.

### b.    Criminal Election Statutes

Delaware criminal statutes addressing analogous electoral situations also provide a source of content for applying the Elections Clause. Title 15 of the Delaware Code makes certain election-related conduct a criminal offense. Title 14 of the Delaware Code proscribes certain conduct in school elections. In my view, these criminal statutes reflect

98

public policy determinations about what free and open elections should look like. One means of enforcing those expectations is through criminal proceedings brought by the Attorney General against the persons believed to have violated the laws, and that method appropriately targets individual wrongdoers who have engaged in particular acts with the requisite criminal intent. But that is not the exclusive method. Where widespread misconduct has affected the outcome of an election, the Elections Clause enables a party to pursue a civil proceeding to set aside the election.

By looking to the criminal statutes for guidance, this decision is not seeking to enforce the criminal laws as such. This is not a criminal case, the task of enforcing the criminal statutes lies with the Attorney General, and his office enjoys "broad discretion as to whom to prosecute." *Albury v. State*, 551 A.2d 53, 61 (Del. 1988). This court neither has jurisdiction over criminal proceedings, nor the equitable authority to involve itself in criminal proceedings. *See Econ. Cleaners v. Green*, 184 A. 225, 226 (Del. Ch. 1936) (Wolcott, C.) ("[A]s a general rule courts of equity have no jurisdiction to interfere by injunction with the enforcement of the criminal laws of the State by its duly constituted officers.").

Although the criminal statutes do not apply directly, they remain relevant as evidence of the floor for permissible electoral conduct. In other areas of the law, courts have used criminal statutes to inform how the civil law should apply. One example is the area of negligence, where the Restatement (Third) of Torts explains that "[a]n actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the

class of persons the statute is designed to protect." Restatement (Third) of Torts: Phys. & Emot. Harm § 14 (2010). A violation of a criminal statute operates as conclusive proof that the actor was negligent because the criminal statute reflects a "legislative judgment that acts in violation of the statute constitute unreasonable conduct." 57A Am. Jur. 2d *Negligence* § 675. Delaware follows this doctrine. *Sammons v. Ridgeway*, 293 A.2d 547, 549 (Del. 1972).

Criminal statutes have been used to flesh out constitutional parameters. When analyzing "the tension between the right which the First Amendment accords to a free press . . . and the protections which various statutes . . . accord to personal privacy," the United States Supreme Court relied on criminal statutes to illuminate the point where personal privacy concerns overcame First Amendment freedoms.[67] The California Supreme Court engaged in similar reasoning by looking to state criminal statutes to give content to a person's reasonable expectation of privacy. *See Shulman v. Gp. W Prods., Inc.*, 955 P.2d 469, 493-96 (Cal. 1998).

Two criminal statutes are particularly relevant to the activity in this case. The first is an anti-bribery statute. *See* 14 *Del C.* § 1079 (the "Anti-Bribery Statute"). The second is an anti-electioneering statute. *See id.* at § 1087 (the "Anti-Electioneering Statute").

i.    **The Anti-Bribery Statute**

---

[67] *Florida Star v. B.J.F.*, 491 U.S. 524, 530 (1989); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979).

The Anti-Bribery Statute makes a simplified version of the Anti-Bribery Clause applicable to school elections. It states:

> (a) No person who receives or accepts or offers to receive or accept, or pays, transfers or delivers, or offers or promises to pay, transfer or deliver, or contributes or offers or promises to contribute to another to be paid or used, any money or other valuable thing as a compensation, inducement or reward for giving or withholding or in any manner influencing the giving or withholding a vote at any public school election, shall vote at such election unless such person being challenged for any of said causes takes and subscribes to the oath or affirmation as provided for in § 4940 of Title 15.

> (b) Such oath or affirmation shall be conclusive evidence to the election officers of the truth of such oath or affirmation, but if any such oath or affirmation shall be false, the person making the same shall be guilty of perjury . . . . Such oath or affirmation, when signed and attested as provided in this section shall be competent evidence in any proceeding against the party making the same.

*Id.* at § 1079.

The Anti-Bribery Statute makes it a criminal violation to offer or provide "any money or other valuable thing as a compensation, inducement or reward for giving or withholding or in any manner influencing" a person's vote in a public school election. *Id.* at § 1079(a). This provision supports the conclusion that if a participant in a school election has engaged in widespread conduct that involved providing "any money or other valuable thing" as an inducement or reward for voting or to influence voting, then the election has not been "free and equal" for purposes of the Elections Clause. For reasons already discussed, the ability of the Attorney General to bring charges against specific individuals for violations of the Anti-Bribery Statute does not preclude reliance on the Anti-Bribery Statute as an expression of what it means to hold a free and equal election in the State of Delaware.

### ii.     The Anti-Electioneering Statute

Section 1087 of Title 14 prohibits "[e]lectioneering as described in § 4942 of Title

15 . . . in any school election." *Id.* at § 1087. Section 4942 of Title 15 states:

> (a) No election officer, challenger or any other person within the polling place or within 50 feet of the entrance to the building in which the voting room is located shall electioneer during the conduct of the election. No political headquarters or gathering shall be permitted within that building during the conduct of the election.
>
> (b) Whoever violates subsection (a) of this section shall be fined not more than $200 or imprisoned not more than 90 days, or both.
>
> (c) Whoever, being an election officer, violates subsection (a) of this section shall be deemed to have knowingly and willfully violated that election officer's own official duty.
>
> (d) For the purposes of this section, the following definition shall apply:
>
> "Electioneering" includes political discussion of issues . . . or partisan topics, the wearing of any button, banner or other object referring to issues . . . or partisan topics, the display, distribution or other handling of literature or any writing or drawing referring to issues . . . or partisan topics, the deliberate projection of sound referring to issues . . . or partisan topics from loudspeakers or otherwise into the polling place or the area within 50 feet of the entrance to the building in which the voting room is located.

15 *Del. C.* § 4942. This too is a criminal statute. It applies to this case only as a means of

giving content to the Elections Clause. As with the Anti-Bribery Statute, the existence of

the Anti-Electioneering Statute suggests if a participant in a school election engages in

widespread electioneering that affected the outcome of the election, then the election has

not been "free and equal" for purposes of the Elections Clause.

### c.     The Anti-Bribery Clause

A similar source of content for the Elections Clause is the Anti-Bribery Clause.

*See* Del. Const. art. V, § 7. The delegates to the Convention of 1896-97 adopted the Anti-

Bribery Clause, despite the existence of anti-election bribery statutes already on the books. Their priority was to restore the integrity of the electoral process. The drafters of the Constitution of 1897 did not revisit the Elections Clause itself because it was part of the Declaration of Rights, which they did not want to alter. *See supra* Part II.C.2.c.

The Anti-Bribery Clause responded to widespread nineteenth century practices in which political parties and candidates provided items of value in return for votes. The items included small sums of money, liquor, and various types of gifts. To address these behaviors, the Anti-Bribery Clause made it a constitutional criminal offence to use any "money or other valuable thing" to "influenc[e]" voting or as a "compensation, inducement or reward" for voting. *See supra* Part II.C.2.c. A violation of the Anti-Bribery Clause does not require a "corrupt motive."[68]

The Anti-Bribery Clause applies to "any general, special, or municipal election." Del. Const. art. V, § 7. The Delaware Code describes a school referendum on taxes as a "special election." [69] The Anti-Bribery Clause does not apply directly to this case because

---

[68] *State v. Collins*, 42 A. 619, 622 (Del. Ct. Gen. Sess. 1898); *see* Holland, *Delaware State Constitution*, *supra*, at 205.

[69] 14 *Del C.* § 1903 ("Before any school board levies a tax [it] shall call a special election to be held at the polling place or places designated by the Department of Elections conducting the elections."); *see Brennan v. Black*, 104 A.2d 777, 780 (Del. 1954) (noting the requirement that a school district hold a "special election"); 8 Del. Laws ch. 21, § 5 (1830) (requiring approval of voters in school district before the levying of a school-related tax). In 2006, the Delaware Attorney General opined that the Anti-Bribery Clause did not apply to a school referendum. *See* Del. Op. Att'y Gen. 06-IB04, 2006 WL 1242015 (Mar. 23, 2006). The opinion rested on the text of the Anti-Bribery Clause, which states that it applies to "any general, special, or municipal election in this State, or at any primary election, convention or meeting held for the purpose of

103

it is a criminal provision. Nevertheless, as with the Election Contest Statute, the Anti-Bribery Statute, and the Anti-Electioneering Statute, the Anti-Bribery Clause can inform the Elections Clause analysis because its existence underlines the principle that an election in which certain voters received money or other valuable things for their votes is not "free and equal."

### d. The Delaware Equal Accommodation Act

The Delaware Equal Accommodation Act prohibits discrimination against the aged and disabled. It states:

> No person being the owner, lessee, proprietor, manager, director, supervisor, superintendent, agent or employee of any place of public accommodation, shall directly or indirectly refuse, withhold from or deny to any person, on account of race, age, marital status, creed, color, sex, disability, sexual orientation, gender identity or national origin, any of the accommodation, facilities, advantages or privileges thereof.

6 *Del. C.* § 4504(a). The statute is intended "to prevent, in places of public accommodations, practices of discrimination against any person because of race, age, marital status, creed, color, sex, physical disability, sexual orientation, gender identity or national origin." *Id.* at § 4501. The statute "shall be liberally construed to the end that the rights herein provided for all people, without regard to race, age, marital status, creed,

---

nominating any candidate or candidates to be voted for at such general, special, or municipal election." Del. Const. art. V, § 7. The Attorney General's opinion did not discuss *Brennan* or Section 1903 of Title 14, both of which refer to a school tax referendum as a "special election." In the same opinion, the Attorney General suggested that the plaintiffs might have a cause of action under Section 5162 of Title 15. That section also applies only in a "general, special or municipal election." 15 *Del C.* § 5162.

color, sex, physical disability, sexual orientation, gender identity or national origin, may be effectively safeguarded." *Id.*

As with the criminal provisions, the Delaware Equal Accommodation Act does not apply directly to this case. *See supra* Parts II.G.2.b-c. It nevertheless represents a legislative determination as to what it means to be equal under Delaware law. Among other things, equality means a lack of discrimination in public accommodations based on age or disability. It follows that if there was widespread discrimination based on age or disability during an election, then the election was not "equal" for purposes of the Elections Clause.

### 3. Applying The Standards To The Conduct Alleged In The Complaint

Having strived to flesh out the meaning of the Elections Clause, this decision now attempts to apply those principles to the conduct alleged in the Complaint. As with the federal claim, the plaintiffs have challenged Red Clay's electoral interventions as a whole, but for analytical clarity, this decision uses the three broad categories presented in the public policy discussion: government campaign speech, selective get-out-the-vote efforts, and selective rewards for voting.

#### a. Selective Rewards For Voting Under The Elections Clause

The most straightforward claim under the Elections Clause is the contention that Red Clay provided selective rewards for voting. An election in which certain groups of citizens receive rewards for voting is neither "free" nor "equal." The rewards affect how the electors think about voting, making the vote less free. The fact that the rewards are

only provided to certain groups of citizens makes the election unequal. The prohibition violates the text of the Elections Clause, as well as cases that have interpreted similar clauses as protecting the right of every voter to cast his ballot as his own judgment and conscience dictate. *See supra* Part II.G.1. It also contravenes the prohibition on providing money or any other valuable thing as a reward or inducement for voting that embodied in the Anti-Bribery Clause and the Anti-Bribery Statute. In a candidate election, it would provide a basis for challenging the outcome under the Election Contest Statute. More generally, addressing widespread practices involving the exchange of money and other valuable things for votes was a central focus of the Constitutional Convention of 1896-97, which produced the Anti-Bribery Clause. A violation of the clause does not require a "corrupt motive." *Collins*, 42 A. at 622. It requires only that money or something of value be given as a reward or inducement for voting.[70]

---

[70] Federal law similarly proscribes paying for votes. *See* 52 U.S.C. § 10307(c); *United States v. Thomas,* 510 F.3d 714, 723-24 (7th Cir. 2007) (affirming conviction for conspiracy to violate act based on plan to "take care of" voters who "expect something" and budget suggesting payments of five dollars per voter); *United States v. Daugherty*, 952 F.2d 969, 971 (8th Cir. 1991) (affirming conviction for violating act based on plan to pay three to five dollars in exchange for votes); *United States v. Garcia*, 719 F.2d 99, 104 (5th Cir. 1983) (affirming conviction under act where defendants provided welfare food vouchers in exchange for votes); *United States v. Thompson*, 2009 WL 331482, at *7 (E.D. Ky. Feb. 9, 2009) (evidence supported conviction where defendant agreed to deliver his family's votes in return for candidate paving his driveway). Further evidencing Delaware's strong objection to any type of payment for voting, the federal provision was sponsored by Senator John J. Williams of Delaware as an amendment to the Voting Rights Act. When he introduced this amendment, he stated: "[T]he amendment would provide a penalty for anyone offering or accepting money or something of value in exchange for registering or voting." 111 Cong. Rec. S8423 (daily ed., April 26, 1965).

Based on the facts alleged, the Complaint pleads a claim that Red Clay violated the Elections Clause by holding the Family-Focused Events. By structuring rewards that would appeal to voters with children, Red Clay provided something of value to that favored group to induce them to vote. The clearest examples were the paper chits at Baltz Elementary School that holders could turn in for pizza after they voted and the free dinner held at Heritage Middle School, but the analysis extends to all of the events that Red Clay held on the day of the Special Election at the schools where the polling places were located. *See Smith v. Dorsey*, 599 So. 2d 529, 539-40 (Miss. 1992) (affirming ruling by Court of Chancery that expenditures for a "fish fry" held in support a bond referendum were improper under state law).

### b. Government Campaign Speech: The Limited Advocacy Principle

Next is the plaintiffs' challenge to Red Clay's government campaign speech. Unlike federal challenges under the Free Speech Clause, state law challenges to government campaign speech have succeeded.[71] In *Brennan*, the Delaware Supreme

---

[71] *See Stanson v. Mott*, 551 P.2d 1, 10-11 (Cal. 1976) (en banc) (holding that although state agency could disseminate "information" to the public in an election campaign, it could not use money to spread "promotional" materials); *Palm Beach Cty. v. Hudspeth*, 540 So. 2d 147, 154 (Fla. Dist. Ct. App. 1989) (holding that government can only use funds only for neutral reasons because the government's resources would enable it to drown out opposing views); *Rees v. Carlisle*, 153 P.3d 1131, 1137-39 (Haw. 2007) (holding that prosecutor violated state law by acting as advocate in state constitutional amendment vote because granting the prosecutor power to promote issues would be unfair); *Anderson v. City of Boston*, 380 N.E.2d 628, 639 (Mass. 1978) ("Fairness and the appearance of fairness are assured by a prohibition against using public tax revenues to advocate a position which certain taxpayers oppose."); *Smith v. Dorsey*, 599 So. 2d 529, 549 (Miss. 1992) (finding that school board's fish fry and payment for campaign workers

Court permitted a school district to engage in limited advocacy in favor of a referendum, but held that the "expenditure of public funds in support of one side" must remain "within reasonable limits" and that the school district's speech should not venture "beyond [a] factual presentation" to the point of "overstatement and emotional appeals." 104 A.2d 777, 790 (Del. 1954). This decision refers to *Brennan*'s holding as the "Limited Advocacy Principle."

The coincidentally named *Brennan* decision built on an influential opinion written by future Supreme Court Justice William Brennan while he was a member of the New Jersey Supreme Court. *See Citizens to Protect Public Funds v. Board of Education*, 98 A.2d 673 (N.J. 1953). In *Citizens*, a school board decided to issue bonds to finance the

---

to support a school bond referendum "constituted illegal promotional efforts"); *Burt v. Blumenauer*, 699 P.2d 168, 175-76 (Or. 1985) (en banc) (finding that "principles of representative government" would limit government speech involving "electoral or political advocacy"); *Stern v. Kramarsky*, 375 N.Y.S.2d 235, 239 (Sup. Ct. Spec. Term 1975) (finding that state agencies "cannot advocate their favored position on any issue or for any candidates" and "must maintain a position of neutrality and impartiality" on state constitutional grounds); *see also D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 2, 9 (D.C. Cir. 1988) (holding that municipal taxpayers had standing to challenge "expenditures by the District of Columbia government to *influence* the outcome of an initiative," and affirming district court's finding that such expenditures were illegal on statutory and federal constitutional grounds); *Coffman v. Colo. Common Cause*, 102 P.3d 999, 1011 (Colo. 2004) (en banc) (finding that government must have specific statutory grant to be able "to advocate for or against any measure pending before the electorate"); *Ameritel Inns, Inc. v. Greater Boise Auditorium Dist.*, 119 P.3d 624, 630 (Idaho 2005) (finding that because legislature did not grant local government entity ability to expend money to support or oppose a measure to be voted on, it could not); *Elsenau v. City of Chicago*, 165 N.E. 129, 131 (Ill. 1929) (finding that a city did not have the authority to disseminate information "partisan in its nature, to induce the voters to act favorably upon the bond issues submitted at the election"). *See generally* André, *Government Election Advocacy*, *supra*, at 846-47, 878.

expansion of several school buildings, which the board believed was necessary to provide adequate educational facilities for the town's children. The bond issuance required a favorable vote in a referendum. The school board spent public funds to print and disseminate an eighteen-page booklet urging voters to "Vote Yes" on the referendum, with an additional page providing a list of bleak consequences in response to the question, "What Will Happen If You Don't Vote Yes?" *Id.* at 674. A group that opposed the bond issue alleged that the school district had violated New Jersey law.

On these facts, the New Jersey Supreme Court held that the school board's advocacy was improper, characterizing it as unfair to citizens with different views:

> [T]he board made use of public funds to advocate one side only of the controversial question without affording the dissenters the opportunity by means of that financed medium to present their side, and thus imperiled the propriety of the entire expenditure. The public funds entrusted to the board belong equally to the proponents and opponents of the proposition, and the use of the funds to finance not the presentation of facts merely but also arguments to persuade the voters that only one side has merit, gives the dissenters just cause for complaint. The expenditure is then not within the implied power and is not lawful in the absence of express authority from the Legislature. . . .

> We are persuaded, however, that simple fairness and justice to the rights of dissenters require that the use by public bodies of public funds for advocacy be restrained within those limits in the absence of a legislative grant in express terms of the broader power.[72]

---

[72] 98 A.2d at 677-78. Notably, by the time of the decision, the referendum had passed, and the court regarded the issue of the booklet as moot. The court nevertheless decided that the legal issue was important enough to warrant addressing. *See id.* at 676.

Notably, the *Citizens* ruling adopted a stricter line than what the Delaware Supreme Court would adopt in *Brennan*. In contrast to the Limited Advocacy Principle, the *Citizens* decision stated that the school board could not engage in advocacy at all.

Despite rejecting the school board's ability to engage in advocacy, the New Jersey Supreme Court did not insist that government agencies remain silent. The court recognized that voters need information, that a government body is well positioned to provide it, and that "it is not only the right but perhaps the duty of the body to endeavor to secure the assent of the voters."[73] The court suggested that a government agency could serve this need by spending money to inform voters. For example, it could make "reasonable expenditures" to purchase radio advertisements that presented both sides' views on the building expansion. 98 A.2d at 676. But using money to try to convince voters to "Vote Yes" was not fair to those who wanted to "Vote No."

Another leading example of this approach is *Stanson v. Mott*, 551 P.2d 1 (Cal. 1976) (en banc), which also relied heavily on *Citizens*. The *Mott* case involved efforts by the California Department of Parks and Recreation to promote a bond referendum that

---

[73] *Id.* at 676-77. In this respect, the *Citizens* court followed an earlier New Jersey decision that had affirmed a ruling permitting government campaign speech. *See*, *e.g.*, *City Affairs Comm. v. Bd. of Comm'rs*, 41 A.2d 798, 800 (N.J. Sup. Ct. 1945) ("We think municipalities may, within their discretion and in good faith, present their views for or against proposed legislation or referendum to the people of questions which in their judgment would adversely affect the interests of their residents. To accomplish this purpose we think they may incur expenditures by the publication of pamphlets, circulars, newspaper advertisements or radio addresses and that to do so is a proper governmental function."), *aff'd*, 46 A.2d 245 (N.J. 1946). The *Citizens* court noted that the limitations it imposed on government campaign speech had not been suggested by the earlier ruling. 98 A.2d at 678.

would authorize financing to acquire park lands and historical facilities. As in *Citizens*,

the Supreme Court of California started by examining whether a statute authorized the

expenditure of funds to "*promote*" the success of the bond referendum. *Id.* at 7-8. Finding

no explicit authority, the California Supreme Court observed that "every court which has

addressed the issue to date has found the use of public funds for partisan campaign

purposes improper, either on the ground that such use was not explicitly authorized or on

the broader ground that such expenditures are never appropriate." *Id.* at 8-9 (citations

omitted). The court explained the rationale for this line of authority as follows:

> Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not "take sides" in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (*see, e.g.*, Madison, *The Federalist Papers*, Nos. 52, 53; 10 J. Richardson, *Messages and Papers of the Presidents* (1899) pp. 98-99 (President Jefferson)); the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process.[74]

The California Supreme Court noted that prior authorities had not distinguished "between

'ballot measure' and 'candidate' campaigning," and it declined to take that step. 551 P.2d

---

[74] *Id.* at 9. *See* 1 James D. Richardson, *A Compilation of the Messages and Papers of the Presidents*, 1789-1897, at 98-99 (1899) (Thomas Jefferson) ("[I]t is expected that [a government official] will not attempt to influence the votes of others nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it."); André, *Government Election Advocacy*, *supra*, at 843 (equating the neutral view with the view "accepted by Madison and Jefferson").

at 9. The *Mott* decision reasoned that allowing a government agency to use public funds to favor one side would compromise the integrity of a free election, and the "importance of governmental impartiality in electoral matters" meant that the state could not "distort[] the preference of participating voters." *Id.* at 10.

Of particular note, the *Mott* decision observed that government campaign speech ran afoul of California's version of the Elections Clause, and that this provision distinguished campaign speech from legislative lobbying:

> [O]ne of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies. Since the legislative process contemplates that interested parties will attend legislative hearings to explain the potential benefits or detriments of proposed legislation, publicly agency lobbying . . . in no way undermines or distorts the legislative process. By contrast, the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave to the "free election" of the people does present a serious threat to the integrity of the electoral process.

*Id.* at 10 (citing Cal. Const. art. II, § 2).

As in *Citizens*, despite holding that the campaign expenditures were improper, the *Mott* decision cautioned that a state agency was not "without power to incur [a]ny expense at all in connection with the bond election." *Id.* The agency could expend funds "to provide the public with a 'fair presentation' of relevant information" relating to the issue under consideration. *Id.* at 11. The California Supreme Court recognized the potential difficulties "in attempting to distinguish improper 'campaign' expenditures from proper 'informational' activities," but observed that with respect to some items, "the distinction is rather clear." *Id.*

[T]hus, the use of public funds to purchase such items as bumper stickers, posters, advertising "floats," or television and radio "spots," unquestionably constitutes improper campaign activity, as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. On the other hand, it is generally accepted that a public agency pursues a proper "informational" role when it simply gives a "fair presentation of the facts" in response to a citizen's request for information or, when requested by a public or private organization, it authorizes a[n] agency employee to present the department's view of a ballot proposal at a meeting of such organization.

*Id.* at 11-12 (citations omitted). The *Mott* court suggested that when the line was unclear, "the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." *Id.* (footnote omitted).

This brings us to *Brennan*, which remains the only Delaware Supreme Court case to address government campaign speech. That case involved a challenge to various actions that a school district took to promote a bond referendum:

During the year 1953 and particularly in September and early October, there were held various meetings of Parent-Teacher Associations of certain of the public schools, including the schools of the Mount Pleasant District. At one or more of these meetings there were discussions of the [referendum], by certain school officials. Publicity was given prior to these meetings by statements in the public press, and by circulars, all of which was entirely appropriate and desirable. In addition, a letter . . . addressed to "Parents and Patrons" on the letterhead of the Mount Pleasant School District, was prepared and sent out by the Superintendent of Schools. This letter is almost wholly factual in nature. . . . It does contain one or two statements indicating that the proposed building program should in the judgment of the Superintendent of Schools, be supported by the District. In addition, a memorandum or circular urging [approval] was prepared and circulated, and also a circular containing sketches of children and showing the need for immediate action to provide more class rooms, equipment, etc., couched in language as to appeal to the nature desire of parents for good education for their children.

113

104 A.2d at 790. Voters who opposed the tax increase challenged these activities, arguing primarily that they violated state law, including the Elections Clause.

In ruling on the propriety of the communications, the Delaware Supreme Court generally followed *Citizens*, but went beyond that decision by permitting the school district to engage in limited advocacy. Recognizing that a school district must manage, maintain, and improve schools, the Delaware Supreme Court held that the district could use "reasonable publicity to bring the issues before the voters." *Id.* The *Brennan* decision cautioned, however, against advocacy that went too far:

> It does seem to us that some of the publicity urging support of the [referendum], such as the appeals "to get out the vote", [sic] and the statement that the voters' approval of the program is "a *must*" if they are to continue to have a good school system, went somewhat beyond the factual presentation which would have been more decorous in an official statement of the case. The expenditure of public funds in support of one side of the matter should be kept within reasonable limits. The temptation to any public official to overemphasize the importance and the urgency of a project which he sincerely believes is necessary is understandable; but overstatement and emotional appeals in circulars and other similar matter prepared and distributed at public expense are to be avoided.

*Id.* On the facts of *Brennan*, the Delaware Supreme Court held that the communications were not sufficient to set aside the outcome of the referendum, because there was "no showing whatever that the voters were improperly influenced in any way," and the issues were fairly "presented and debated" because of a competing campaign effort by an organization that opposed the referendum. *Id.*

By authorizing "[t]he expenditure of public funds in support of one side," as long as the expenditures were "kept within reasonable limits," the *Brennan* decision departed from *Citizens* and adopted the Limited Advocacy Principle. In the decades since

114

*Brennan*, the Delaware courts have yet to explore the point at which a government goes "beyond the factual presentation" to the point of "overstatement and emotional appeals." Nor have the Delaware courts addressed what it means to keep "[t]he expenditure of funds in support of one side . . . within reasonable limits." *Id.* Nevertheless, at present, Delaware seems to permit limited advocacy within these parameters.

In this case, the Complaint alleges that Red Clay engaged in the following examples of broadly directed campaign speech:

- Mailings of the Red Clay Record and postings on the district website.

- Public meetings and workshops.

- Statements to the press.

- Signs in and around the schools, such as the sign at Baltz Elementary that stated, "Support the Baltz Bear by voting yes."

- Parents stationed at schools on the day of the Special Election to encourage voters to support the tax increase, such as the parents at A.I. DuPont Middle School who sat at desks by the entrance and told prospective voters that if they did not vote in favor, students would not have after-school activities.

Red Clay also engaged in targeted campaign speech. The example cited in the Complaint was Superintendent Daugherty's letter to families with school-aged and pre-school-aged children urging them to vote in favor of the tax increase.

The Limited Advocacy Principle appears to permit Red Clay to engage in broadly directed government campaign speech, such as mailing the Red Clay Record, posting material on the district website holding public meetings and workshops, and making statements to the media. The Limited Advocacy Principle contemplates that "[t]he expenditure of public funds in support of one side" will be "kept within reasonable

limits," but the Complaint does not support a reasonable inference that Red Clay's broadly directed government campaign speech, standing alone, resulted in an excessive expenditure of public funds. Were these the only activities in which Red Clay engaged, the Complaint would not state a claim under the Elections Clause.

Superintendent Daugherty's letter, by contrast, resembled the communications criticized by the Delaware Supreme Court in *Brennan*. Like the letter in that case, Superintendent Daugherty's letter was predominantly factual but contained some advocacy. It described the vote as "critical" and as having "a very direct impact on our children." Compl. Ex. B. It identified school programs dear to parents' hearts, then described them as "the very things we are in danger of losing." *Id.* The letter closed with an exhortation: "I urge you to come to the polls on Feb. 24 from 10 a.m. to 8 p.m. at any Red Clay school and cast a vote for your child's future. Every vote is so important!" *Id.* Under a strict reading of *Brennan*, this went too far. Superintendent Daugherty made the type of emotional appeal that the *Brennan* court criticized, and his word choice resembled the description in *Brennan* of a favorable outcome as "'a *must*,'" which the Delaware Supreme Court said was improper.

A caveat, however, is in order. I suspect that in today's news-and-advertisement-saturated age, the Delaware Supreme Court would expand the Limited Advocacy Principle. The high court could well regard contemporary voters as more media savvy and less trusting of government than denizens of a seemingly simpler era culturally stereotyped by *Leave It To Beaver* and *Father Knows Best*. The electorate of sixty years ago might be seen as imbued with a post-World War II confidence in state institutions

116

and held together by a nascent Cold War fear of communism which, along with other cultural factors, generated a greater respect for institutional authority and hence a greater obligation on the part of institutional actors not to abuse voters' trust. The initial round of shocks to that outlook included the countercultural awakening of the 1960s and Watergate-era revelations about the misuse and abuse of government power. Each ensuing decade brought shocks and scandals of its own. A more worldly and skeptical twenty-first century electorate could well be viewed as less susceptible to being misled by officials deploying urgent language and making emotional appeals.

I also suspect that the Delaware Supreme Court would be concerned about whether litigants could mount challenges to government campaign speech too readily by arguing about largely subjective factors like word choice and tone. It seems to me that if presented with the issue, the high court would expand the degree of deference given to a school district in crafting its speech. A more flexible inquiry would require at a minimum that government statements be both accurate (in the sense of factually supported) and truthful (in the sense that the speaker subjectively believed them). Facts and circumstances like tone and timing would continue to play a role, but more important factors would include (i) whether the communication identified itself transparently as coming from a government source, so that the recipient could take into account the speaker's goals and interests, (ii) the degree to which recipients could avoid the message or access other points of view, and (iii) the vulnerability of the audience, such as whether it comprised children or youth. *Cf.* Norton, *Government Campaign Speech*, *supra*, at 238-

117

39 (identifying similar factors). A government speaker still might go too far, but it would require more extreme communications.

Judged by these standards, Superintendent Daugherty's letter would not be problematic. The plaintiffs have not suggested that it was factually inaccurate or that Superintendent Daugherty did not subjectively believe the views he expressed. The letter's language was not materially different from the everyday product advertisements that bombard us or the fundraising appeals that clog our mailboxes. The letter was transparently government campaign speech, so readers could consider whether Superintendent Daugherty's employment might have influenced (and not illegitimately) the content of his message. Readers were not forced to read the letter; they could avoid it easily by throwing it in the trash can. The letter did not contain any coercive threats, nor did it suggest some way in which the government might retaliate. Only an irrational and unhinged conspiracy theorist might fear that Red Clay was monitoring whether recipients voted as the letter suggested and could retaliate against property owners or their children.

This decision does not apply this more liberal version of the Limited Advocacy Principle at the pleading stage, both because the Complaint pleads a claim under *Brennan* and because it is not possible presently to separate the various components of Red Clay's electoral interventions. The parties can engage at a later stage regarding the proper scope of the Limited Advocacy Principle and how it should apply to the facts as they develop during discovery. It may well be possible to determine after trial that Superintendent Daugherty's letter did not contribute meaningfully to the outcome of the Special Election.

Even under an expanded view of the Limited Advocacy Principle, the parents stationed at schools to encourage voters to "vote yes" present problems. The speech appeared to come from private speakers (parents), yet one can infer at this stage that it was endorsed and supported by Red Clay. When government speech is disseminated through private speakers, the question arises as to whether the origins of the speech are sufficiently transparent. Using parents as the medium disguised the official origins of the speech and made it more difficult for listeners to assess its content. The parental appeals were made in person and thus more direct and emotion-laden. They also occurred when voting was imminent, so voters could not readily balance them with competing views. Because of the location and timing of the encounters, they were difficult if not impossible to avoid. At the pleading stage, this combination of factors states a claim, even under an expanded version of the Limited Advocacy Principle.

The signs fall in between the parent communications and the Superintendent's letter. It seems likely that voters would recognize the signs as advocacy pieces and not be overly swayed. At the same time, the signs represent a specific category of materials that the *Mott* decision labeled improper. Although they likely pass muster under an expanded version of the Limited Advocacy Principle, it is best to defer any decision regarding the signs until a later stage of the case.

Based on this analysis, taking the conduct as a whole and following *Brennan*, the Complaint states a claim for a violation of the Elections Clause based on Red Clay's government campaign speech. At a later stage of the case, after discovery, it should be possible to parse the types of government campaign speech more finely.

119

### c. Government Campaign Speech: The Anti-Electioneering Statute

In addition to stating a claim under *Brennan*, the plaintiffs have stated a claim against Red Clay's government campaign speech in light of the Anti-Electioneering Statute. Red Clay engaged in conduct that potentially ran afoul of that statute by (i) holding the Family-Focused Events in the school buildings where voting was taking place, and (ii) engaging in electioneering in close proximity to the voting rooms.

### i. The Family–Focused Events As Improper "Gatherings"

The Anti-Electioneering Statute states that "[n]o political headquarters or gathering shall be permitted within [the building in which the voting room is located] during the conduct of the election." 15 *Del. C.* § 4942. The plaintiffs contend that the Family-Focused Events were "gatherings" held within the buildings where the voting rooms were located. For pleading purposes, that contention states a claim.

A key interpretive question for analyzing this claim is whether the adjective "political" modifies only the term "headquarters" or also the term "gathering." One reasonable interpretation of the statute would be to prohibit "gatherings" in general, precisely to avoid the problem of crowded parking lots and diminished access that has been identified as an issue in this case. Another reasonable interpretation would be that the statute prohibits only "political . . . gatherings." That interpretation would reflect the focus on Section 4942 on "electioneering" activities.

There does not appear to be any Delaware case that addresses this question. The parties have not pointed to any secondary authority on voting law. Nor have they cited

any cases from other jurisdictions. That is not to say there aren't any; the parties seem not to have looked. There also may be evidence about Delaware custom and practice during elections that would support a particular interpretation.

At some point, this court will have to construe the statute. "Election laws are to be construed liberally because of the importance of the public's right to vote." *See Republican Party of State v. Dep't of Elections of New Castle Cty.*, 792 A.2d 224, 226 (Del. Super. 2001). "Election laws are not merely technical creatures creating or regulating private rights. They are of transcending public importance, touching upon— indeed giving vitality to—the most fundamental of our rights." *Bartley v. Davis*, 1986 WL 8810, at *9 (Del. Ch. Aug. 14, 1986) (Allen, C.), *aff'd*, 519 A.2d 662 (Del. 1986). It would seem that absent persuasive authority indicating otherwise, the court would err on the side of protecting voting rights against government interference.

Because the parties have not adequately briefed these issues, it would be unwise to interpret the statute at this stage. For present purposes, it is reasonably conceivable that the Family-Focused Activities violated the statutory limit on electioneering, which in turn supports a claim under the Elections Clause.

### ii. Electioneering Within Fifty Feet Of The Voting Rooms

The Anti-Electioneering Statute states that no person shall engage in electioneering "within the polling place or within 50 feet of the entrance to the building in which the voting room is located . . . during the conduct of the election." 15 *Del. C.* § 4942. Red Clay engaged in "electioneering." Examples include the signs posted in and

121

around the schools, such as the sign at Baltz that stated, "Support the Baltz Bear by voting yes," and the parents stationed near polling places to encourage voters to support the tax increase. The question is whether the electioneering occurred too close to the voting rooms. The Complaint's allegations support an inference that Red Clay posted signs and had parents engage in electioneering within 50 feet of the voting rooms, albeit inside the school buildings where the voting rooms were located.

As with the interpretation of "gathering," there are ambiguities in the statute's description of the area where electioneering is prohibited. The Anti-Electioneering Statute treats the terms "voting room" and "polling place" as smaller locations within a larger "building."[75] It is not clear at present whether the statute uses the terms "voting room" and "polling place" interchangeably, or whether it regards the "voting room" as a specific area within the "polling place." In my personal experience as a voter and checker-challenger, the polling place often encompasses several rooms and hallways that one passes through to reach the voting room. At least preliminarily, it seems to me that the voting room refers to an area within the polling place, and that electioneering is prohibited within a larger area that the statute defines as the "polling place."

---

[75] *See* 14 *Del. C.* § 1072(b) (requiring Department of Elections to "designate and procure the buildings within the district . . . which shall be used as polling places for any public school election" and stating that "[w]henever possible, such polling place shall be located in public buildings, which shall include suitable schools"); *id.* at § 1073 (making election inspector "responsible for the setup, operation and closing of the polling place"); *id.* at § 1082 (describing procedures for voters "at the polling place"); *id.* at § 1088 (identifying the persons who shall be "admitted within the voting room").

Similar ambiguities confront the fifty-foot, electioneering-free area that the statue appears to contemplate around the area where the voting room is located. The statute expressly prohibits electioneering "within 50 feet of the entrance to the building in which the voting room is located." It does not address what should be done if the building provides multiple external and internal points of access to the area where voting is taking place. It would seem bizarre to prohibit electioneering outside within fifty feet of an entrance, yet permit electioneering inside without any limits.

Some insight as to how the statute should be applied can be gleaned from another provision, which states that a

> [p]erson or persons with other business within the building in which a polling place for a public school election is located may pass through the polling place area or by the room in which the polling place is located so as not to interfere with the conduct of the election. Such person or persons shall not loiter within 50 feet of the polling place, talk to any person or persons waiting to vote, promote any candidate or side to an issue, or in any other manner interfere with voters or disrupt the polling place.

*Id.* at § 1088(b). This language seems to contemplate a fifty-foot-wide, electioneering-free zone around the polling place, including inside the building. When inside the building and within that area, individuals should not be doing anything other than "pass[ing] through," and then only in a manner that will "not interfere with the conduct of the election."

There does not appear to be any Delaware case that addresses the fifty-foot zone. Once again, the parties have not pointed to any secondary authority on voting or cases from other jurisdictions. As with the interpretation of the word "gathering," there may be

123

evidence regarding Delaware's custom and practice during elections that would support a particular interpretation. The same principles of statutory interpretation would apply.

Without adequate briefing from the parties, this court will not attempt to provide a definitive answer at this stage. For present purposes, it is reasonably conceivable that Red Clay's activities violated the statutory limit on electioneering, which in turn supports a claim under the Elections Clause.

### d. Selective Get-Out-The-Vote Efforts Under The Elections Clause

The final type of intervention involved selective get-out-the-vote efforts. For reasons that this decision has discussed, I consider this level of conduct to be less serious than selective rewards for voting, but more serious than government campaign speech. As to this conduct, the plaintiffs have stated a claim under the Elections Clause.

The Complaint alleges that Red Clay engaged in the following examples of get-out-the-vote activities directed towards an identifiable group:

- Superintendent Daugherty's use of Red Clay's school messenger system to remind parents of Red Clay students to vote in favor of the tax increase.

- School principals' use of their schools' automated phone systems to encourage families of students to vote in favor of the tax increase.

- Calling students who were eighteen or older out of class and have them vote.

The first two categories seem to fall within the Limited Advocacy Principle's authorization of "expenditure of public funds in support of one side," as long as the expenditures remained "within reasonable limits." The use of the School Messenger system and the schools' automated phone systems seem particularly likely to pass muster,

124

because they do not appear to have involved any incremental expenditure of public funds. I personally believe that a more expansive approach to the Limited Advocacy Principle is warranted and that these steps would survive review under that approach.

For pleading purposes, however, this decision hews to *Brennan*. That decision sought to legitimize activities directed towards the electorate as a whole. It is not clear that the *Brennan* Court would have endorsed targeted efforts, particularly given the general tenor of the opinion and related cases, such as *Citizens* and *Mott*, that stressed the need for the government to remain basically neutral. As with Superintendent Daugherty's letter, once the facts of this case are developed, it may be possible to reach different conclusions. It also may be possible to determine these communications did not contribute meaningfully to the electoral outcome.

Calling students out of class to enable them to vote also seems like conduct that would be upheld at a later stage. It is possible to envision conceptually similar efforts by a school district that could go too far. Red Clay easily could use its fleet of school buses and established school bus routes to bring voters from families with school-aged children to the polls. That type of intervention would present on a larger scale the same issues presented on a smaller scale by calling students out of class to vote.

The specter of such an effort calls to mind "that tritest of legal phrases—ye olde 'slippery slope.'" *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 818 (Del. Ch. 2007) (Strine, V.C.). "Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom." Robert H. Bork, *The Tempting of America: The Political Seduction of the Law* 169 (1990). District-wide bussing would present an

intervention that would be an order of magnitude different than taking students of class, providing a ready handhold that a court could use to arrest a precipitous descent.

I personally doubt that the plaintiffs will be able to show that taking students out of class to vote created a problem, but at the pleading stage, a judge cannot weigh evidence. Taking students out of class to vote was part of Red Clay's overall intervention, and the plaintiffs challenge Red Clay's conduct as a whole.

Finally, to the extent this decision has erred by treating the Family-Focused Events as a reward for voting, at a minimum they were selectively targeted get-out-the-vote events designed to appeal to a readily identifiable group that Red Clay believed would support the tax increase. Viewed as such, the Complaint states a viable challenge under the Elections Clause to the Family-Focused Events. The *Abbott* decision stated that the purpose of the Elections Clause "is to ensure that the right of citizens to vote in an election is unfettered." 2008 WL 821522, at *19 (Del. Ch. Mar. 27, 2008). Cases from other jurisdictions indicate that "[a]n election is free where the voters are exposed to no intimidation or improper influence and where each voter is allowed to cast his ballot as his own conscience dictates." *Moran v. Bowley*, 179 N.E. 526, 531 (Ill. 1932). Free elections are essential because "[t]he very purpose of elections is to obtain a full, fair, and free expression of the popular will upon the matter, whatever it may be, submitted to the people for their approval or rejection" *Wallbrecht v. Ingram*, 175 S.W. 1022, 1026 (Ky. 1915).

Historically, the law has focused on forms of "improper influence" that have interfered with the voting rights of disfavored demographic groups by dissuading or

126

preventing them from voting through blatant means like fraud, violence, and intimidation. A government certainly violates the Elections Clause if it skews the outcome of an election in this manner. Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups. In both situations, the government has diminished the voting rights of one portion of the electorate and enhanced the voting rights of another portion of the electorate. In neither case is the election "free and equal."

Using the Family-Focused Events, Red Clay encouraged and facilitated voting by families with school-aged and pre-school-aged children. By doing so, Red Clay made the election unequal, not through traditionally negative means, but through positive means. Whether Red Clay's conduct went too far is necessarily a matter of degree, but for pleading-stage purposes, the plaintiffs have stated a claim under the Elections Clause.

Moreover, in the current case, Red Clay's selective get-out-the-vote efforts had negative effects on the elderly and disabled. As the *Abbott* decision recognized, a potential violation of the Elections Clause exists if the plaintiffs allege that "their access to the polls was disturbed…." 2008 WL 821522, at *20. The Delaware Equal Accommodation Act establishes that public accommodations cannot be withheld or denied "directly or indirectly" to any person based on age or disability.[76] As alleged in

---

[76] By statute, federal law provides similar protection for disabled persons. The American's with Disabilities Act ("ADA") prevents discrimination by federal and state government entities against individuals with disabilities. 42 U.S.C. § 12101. A public entity cannot exclude those with disabilities from their programs and services. *Id.* The entity must make "reasonable modifications" to comply with Title II and provide disabled

the Complaint, the Family-Focused Events generated full parking lots that interfered with the ability of the elderly and disabled to vote. The Complaint alleges specifically that when the plaintiffs sought to vote, there were empty school buses blocking the handicapped spots, and they could not find parking spaces close enough to the polls for ready access. An election in which the government engages in conduct that discriminates against the aged and disabled is not "free and equal."

The evidence ultimately may show that Red Clay did not intend to discriminate and that its activities did not have that effect. For present purposes, the plaintiffs have stated a claim under the Elections Clause.

## III.    CONCLUSION

In challenging Red Clay's electoral interventions as a whole, the Complaint states a claim on which relief can be granted under both federal and state law. Red Clay's motion to dismiss is therefore denied.

---

persons with meaningful access. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). The provisions of the ADA apply to polling places. *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, U.S. Department of Justice (Oct. 14, 2014), *available at* http://www.ada.gov/ada_voting/ada_voting_ta.htm. The "ADA Checklist for Polling Places" published by the United States Department of Justice states that "[v]oters with disabilities who arrive by car need a parking space close to an accessible entrance." *ADA Checklist for Polling Places*, U.S. Department of Justice 6 (Feb. 2004), *available at* http://www.ada.gov/votingscrn.pdf; *see People of New York ex rel. Spitzer v. Cty. of Schoharie*, 82 F. Supp. 2d 19, 22, 26 n.8 (N.D.N.Y. 2000) (granting injunction requiring county to provide sufficient handicapped parking spaces near the entrance of polling sites); *see also Westchester Disabled On the Move, Inc. v. Cty. of Westchester*, 346 F. Supp. 2d 473, 477 (S.D.N.Y. 2004) (finding that "irreparable harm has occurred if disabled voters are required to vote at alternative locations or by absentee ballots").

The parties will proceed with discovery. Based on the materials submitted in support of the Complaint, it seems likely that there will be questions of fact that require a trial. Developments during discovery may prove that expectation incorrect, but the parties should consider whether it makes sense to devote resources to motions for summary judgment. Efficiency likely counsels in favor of a reasonably prompt trial that will enable the court to make factual findings and apply legal principles to the resulting record.

Red Clay has the option of addressing the plaintiffs' contentions by returning to the electorate. This decision has concluded that the plaintiffs would not be able to state a claim for relief if Red Clay only engaged in certain types of conduct and avoided others, such as the Family-Focused Events and electioneering in close proximity to the voting rooms. If Red Clay called for a new special election and limited its electoral interventions, and if Red Clay's voters ratified the result of the February 2015 election by voting in favor of the tax increase, then this litigation would be moot.